

# LITTLER MENDELSON®
A PROFESSIONAL CORPORATION

May 17, 2006

A. Michael Weber
Direct: (212) 583-9600
Direct Fax: (212) 832-2719
mweber@littler.com

**BY HAND**

The Honorable James C. Francis, IV
United States Magistrate Judge
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007

Re: *Rozell v. Ross-Holst, ANDCO, LLC, and Pirozzi*
No. 05 CV 2936 (JGK) (JCF)

Dear Judge Francis:

We write in response to Plaintiff's letter dated May 15, 2006, in which she seeks to quash a third party subpoena that Defendants intend to serve upon Paul Mahon, one of her former employers. Defendants seek very limited testimony from Mr. Mahon regarding the dates of Plaintiff's employment.

Plaintiff does not have standing to object to the issuance of the third party subpoena to Mr. Mahon. *See Ashkinazi v. Sapir*, 2004 U.S. Dist. LEXIS 14523, *7-8 (S.D.N.Y. July 27, 2004). *See also Langford v. Chrysler Motors Corp.*, 513 F.2d 1121 (2d Cir. 1975) ("In the absence of a claim of privilege a party usually does not have standing to object to a subpoena directed to a non-party witness.") (citing Moore's Federal Practice, ¶ 45.05[2]). The mere dates of Plaintiff's employment with Mr. Mahon are in no way privileged or confidential. Indeed, Plaintiff does not argue (nor could she) that she has a protectable privacy interest in that information,[1] only that the subpoena is "harassing" and "embarrassing." Such a claim is insufficient to confer standing. *Ashkinazi*, 2004 U.S. Dist. LEXIS 14523 at *7-8 (plaintiff's assertion that third party subpoena is "harassing" and "serves no purpose" is insufficient to confer standing to quash subpoena). Accordingly, Plaintiff is not permitted to seek to quash this third party subpoena.

In any event, the subpoena to Mr. Mahon has a legitimate foundation and is plainly relevant to this action.

---
[1] Plaintiff made no such claim with respect to identical information sought by Defendants in subpoenae issued to two of her other employers, the Swiss Institute and George Grunebaum, to which she did not object.

THE NATIONAL EMPLOYMENT & LABOR LAW FIRM ™

885 Third Avenue, New York, New York 10022.4834 Tel: 212.583.9600 Fax: 212.832.2719 www.littler.com

ARIZONA
CALIFORNIA
COLORADO
DISTRICT OF COLUMBIA
FLORIDA
GEORGIA
ILLINOIS
MASSACHUSETTS
MINNESOTA
NEVADA
NEW JERSEY
NEW YORK
NORTH CAROLINA
OHIO
PENNSYLVANIA
TEXAS
WASHINGTON

When Plaintiff applied for employment at ANDCO, she stated that she had been employed for four years as an attorney practicing art law at the firm of Lowe & Mahon in Washington, D.C. (A copy of Plaintiff's resume is attached hereto as Exhibit A.) The evidence will show that Plaintiff's purported years of experience practicing art law were a significant factor in ANDCO's decision to hire her as the director of its art collection. At deposition, Plaintiff testified under oath that she had practiced art law for four years, and that the resume she submitted to ANDCO was true and accurate. (The relevant testimony is attached hereto as Exhibit B.)

In the ordinary course of preparing its defense to this action, Defendants' counsel contacted Paul Mahon, the attorney who had employed Plaintiff as an art law associate, to confirm Plaintiff's employment. (Mr. Humowiecki's assertion that Elena Paraskevas-Thadani misrepresented her identity to Mr. Mahon is categorically false.) Mr. Mahon stated that he is certain he employed Plaintiff for *less than one year*, not four years as Plaintiff has claimed.

In light of this revelation, Defendants served a subpoena *duces tecum* upon Mr. Mahon seeking records of Plaintiff's employment. When Plaintiff expressed an objection to the subpoena, the parties conferred and reached an agreement whereby Defendants would limit the scope of the subpoena to documents reflecting Plaintiff's dates of employment, position held, and last salary.[2]

On or about May 3, 2006, Mr. Mahon responded to Defendants' subpoena *duces tecum*, as limited by the parties' stipulation. Unfortunately, Mr. Mahon was able to locate only a handful of documents. Contrary to Plaintiff's assertion, none of the documents produced reflects her dates of employment. They merely indicate that Plaintiff performed a few hours of work for Mr. Mahon in 1993, for which she was paid a total of less than a thousand dollars. (Copies of the documents produced by Mr. Mahon are attached hereto as Exhibit C.)

Because Mr. Mahon was unable to provide any documents from which the length of Plaintiff's employment can be discerned, Defendants seek a very brief and limited deposition from Mr. Mahon so that he may simply confirm what he told Defendants' counsel over the phone -- *i.e.*, that he employed Plaintiff for less than one year. The deposition is unlikely to last more than 10-15 minutes, and Defendants have agreed to conduct it by telephone to

---

[2] Plaintiff's contention that Defendants are "violating" this stipulation by seeking to issue a deposition subpoena to Mr. Mahon is without merit and wholly illogical. Having already agreed that Defendants are entitled to documents regarding Plaintiff's dates of employment with Mr. Mahon, Plaintiff cannot credibly argue that Defendants' attempt to procure precisely the same information by way of a deposition (after no responsive documents were found) is contrary to the "purpose" of their agreement. Moreover, nothing in the stipulation precludes Defendants from seeking discovery from Mr. Mahon by other means if attempts to procure the information through a subpoena *duces tecum* were unsuccessful, as was the case.

spare Plaintiff the expense of traveling to Washington, D.C. The deposition is in no way "harassing," nor is it a "fishing expedition." It will be very brief and focused on one specific piece of information.

Evidence that Plaintiff misrepresented her art-related employment experience is unquestionably relevant. Although Defendants do not believe that Plaintiff's allegations, even if true, are sufficient to survive summary judgment, issues regarding Plaintiff's credibility are likely to play a large role in the event this case is ever tried. That Plaintiff lied to ANDCO regarding her experience and subsequently repeated that lie under oath is directly relevant to her credibility, particularly when coupled with evidence that she: (i) lied under oath about the circumstances of her termination from the Swiss Institute, her employer immediately prior to ANDCO; (ii) conspired with a co-worker to unlawfully download and surreptitiously remove confidential documents from ANDCO's premises; and (iii) committed other dishonest acts during her ANDCO employment. "Disclosure that may reveal information that affects the credibility of a witness' trial testimony may be found to be discoverable." *Tisby v. Buffalo General Hospital*, 157 F.R.D. 157, 170 (W.D.N.Y. 1994) (citing *Davidson Pipe Co. v. Laventhol and Horwath*, 120 F.R.D. 455, 462 (S.D.N.Y. 1988)).

In addition, it is well-established that resume fraud, such as that committed by Plaintiff, is relevant to an after-acquired evidence defense. *See, e.g., McKennon v. Nashville Banner Publishing Co.*, 513 U.S. 352 (1995). Here, the evidence will establish that ANDCO would not have hired Plaintiff if she had been truthful about the limited nature of her art law experience, and that it would have discharged her if it had learned she committed resume fraud. Therefore, Defendants are entitled to reasonable discovery regarding the misrepresentations Plaintiff made to ANDCO when she was hired. *See, e.g., Davenport v. Indiana Masonic Home Foundation, Inc.*, 2003 U.S. Dist. LEXIS 6350, *6-9 (S.D. Ind. Mar. 27, 2003); *Richmond v. UPS Svc. Parts Logistics*, 2002 U.S. Dist. LEXIS 7496, *9-11 (S.D. Ind. Apr. 25, 2002).

Finally, Plaintiff has indicated that she will seek to testify that Defendants violated various laws regarding the acquisition and import of works of art. If such testimony is permitted, Plaintiff's experience and qualifications in the field of art law would be directly relevant to the weight and credibility of her allegations. For this additional reason, Defendants are entitled to discover exactly how long Plaintiff was a practicing art lawyer.

In sum, the information sought by Defendants regarding the dates of Plaintiff's employment with Mr. Mahon is clearly relevant, and Plaintiff's attempt to quash the subpoena should be rejected.[3]

---

[3] Plaintiff's assertion that she will be "embarrassed" if Defendants are permitted to depose Mr. Mahon is disingenuous. Although Plaintiff's mere "embarrassment" would be an insufficient basis

Moreover, Plaintiff's request for a protective order barring Defendants from issuing any further third party subpoenae is wholly improper. Plaintiff has no standing to make such a motion, nor can she ask the court to prematurely adjudicate the propriety of subpoenae that have yet to be issued, whose subject matter is not known, and over which no justiciable controversy currently exists. The parties have already agreed to a procedure whereby they will provide each other with advance notice prior to serving any third party subpoenae, and will refrain from serving the subpoenae until any objections are resolved by the parties or the court. In the event that Defendants in the future seek to issue an additional third party subpoena, Plaintiff will have the opportunity to make specific objections prior to service at that time. There is absolutely no basis for Plaintiff's request that Defendants be preemptively precluded from engaging in further third party discovery.

Finally, Plaintiff's contention that Defendants are seeking to "embarrass" and "harass" her is completely baseless. (Her attempt to impute the alleged conduct of a process server in upstate New York to Defendants is particularly distasteful and egregious.) Plaintiff continues to use such unfounded and offensive allegations as a cudgel to obstruct Defendants' legitimate discovery requests. All of the third party discovery in which Defendants have engaged has been relevant and legitimate, and has been conducted properly and with minimal intrusion. Plaintiff chose to bring this action, undoubtedly knowing that it would be the subject of much discussion in the New York art community. Her case has been amply reported in the media, including on Page Six of the *New York Post*. Having publicly filed and publicized her claims, Plaintiff cannot now seek to prevent Defendants from obtaining relevant discovery merely because she feels "embarrassed" by her own lawsuit.

For the foregoing reasons, Defendants respectfully request that the relief sought in Plaintiff's May 15, 2006, letter be denied in all respects, and that Defendants be awarded their reasonable attorneys' fees incurred in responding thereto.

Respectfully submitted,

A. Michael Weber

AMW/bg

cc: Mark Humoweicki, Esq. (by hand)

---

for denying Defendants relevant discovery, the fact is that Mr. Mahon is already aware of Plaintiff's lawsuit, having been previously served with a subpoena *duces tecum* pursuant to the parties' stipulation. Thus, his brief deposition will cause Plaintiff no further "embarrassment."

EXHIBIT A

# MARY ROZELL

50 West 9th Street, Apt. 6-D, New York, New York 10011
Tel.: (212)-353-2357  e-mail: maryrozell@aol.com
Citizen of the United States and Republic of Ireland

Swiss 925-2085
x14

**EXPERIENCE**

**Sept. 2000 – present**
Managing Director, *Swiss Institute*, New York
- Provide hands-on, entrepreneurial management for growth phase of non-profit institution dedicated to artistic and cultural exchange between Switzerland and the U.S.
- Oversee and coordinate exhibition, library, educational programs and develop key strategic projects with U.S. and international partners
- Responsible for management of administrative and fiscal affairs; work closely with Board on fundraising and capital projects

**1995 – 2000**
Director, International Exhibition Program, *Weimar Cultural Capital of Europe*
- Curated nine gallery exhibitions; developed conceptual themes, wrote and produced multi-lingual exhibition catalogs
- Managed and directed international exhibition program for German state's largest non-profit contemporary art gallery during post-Reunification transition
- Acted as liaison between city and federal governments and gallery in developing policy for joint ongoing project as part of European Union initiative

*The Art Newspaper*, International ed., (London) Germany Correspondent
Sole correspondent in Germany covering exhibitions and art events of international importance; review exhibitions, new architecture and art fairs; report on cultural politics and restitution-related issues

**1989 – 1993**
*Lowe and Mahon*, Associate Arts Attorney, Washington, D.C.
Provided comprehensive legal counsel for art museums and other art institutions including drafting and review of commission, consignment and exhibition contracts; copyright and moral rights issues; estate planning for artists and collectors; and establishment of non-profit associations

**1984-1986**
*Far Brook School*, French and Art History Teacher, Short Hills, New Jersey
Taught French to middle school students; designed and implemented first Art History curriculum

**EDUCATION**

**1993 – 1994**
Courtauld Institute of Art, University of London, England
*Master of Arts*, Art History – Modern Period specializing in German Expressionism
Frank Davis Memorial Scholar, Lucas Research Award
Master's Thesis: *Circulation, Promotion and Display of German Expressionist Architectural Studies in Berlin, 1914-1923*

**1986 – 1989**
Pepperdine University School of Law, Malibu, California
*Juris Doctor* with emphasis on Art Law and International Law
Dean's Merit Scholar, Moot Court Honor Board
Thesis: *Art and the Laws of War: Past Atrocities and the Evolution of Attempts to Protect Art During Periods of Belligerency*
Semester at Tokyo University, Tokyo, Japan (1988)

**1980 – 1984**
Hamilton College, Clinton, New York
*Bachelor of Arts* in French, Minor in History of Art
Phi Sigma Iota Honor Society, Archibald Alexander Foreign Language Scholar
Academic Year at La Sorbonne, Paris, France (1982-3)



DEFENDANT'S EXHIBIT
A
2/1/06

ANDCO-0118

EXHIBIT B

00001
1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  - - - - - - - - - - - - - - - - - - - - - -X
   MARY ROZELL,
3
              Plaintiff,
4
         -against-          Index No.
5                           05CV 2936

6

7  COURTNEY ROSS-HOLST, an individual,
   Andco, LLC, a corporation, and NEIL
8  PIROZZI, an individual,

9

10             Defendants.

11 - - - - - - - - - - - - - - - - - - - - - -X

12             February 1, 2006

13             10:10 a.m.

14

15 DEPOSITION of MARY ROZELL, the Plaintiff herein,

16 taken pursuant to Notice, and held at the offices

17 of Littler Mendelson, P.C, 885 Third Avenue, New

18 York, New York, before Debra A. Levinson,

19 CSR-RMR-CRR, a Court Reporter and Notary Public

20 of the State of New York.

21

22

23

24

00028
1  a year.

2  Q. And what did you earn?

3  A. I don't remember.

4  Q. Prior to that where were you

5  employed?

6  A. I was in graduate school prior to

7  that. I also, during that period, I worked again

8  on a contract basis for Villa Grisebach Auctions,

9  for about a year.

10  Q. Were you paid?

11  A. Yes.

12  Q. How much?

13  A. I think I was paid 5,000 D-Marks a

14  month there.

15  Q. How long did you do that?

16  A. That was about a year.

17  Q. Why did you leave?

18  A. Because I started in Weimar.

19  Q. And where did you work before that?

20  A. Before that I was in London, I was

21  in school. And before that I worked at Loe and

22  Mahon, and then it was just Paul Mahon at the law

23  firm.

24  Q. And, it's a law firm?

00029
1  A. Uh-hum.

2  Q. Located where?

3  A. Washington, D.C.

4  Q. And how long were you there?

5  A. I was there from -- it was either

6 the end of '89 or the beginning of 1990 until I

7 left.

8      MS. PERATIS: Can we just take a

9 break for a second.

10      MR. WEBER: We may.

11

12      (Recess taken.)

13

14      (The requested testimony was

15      read back.)

16

17 BY MR. WEBER:

18  Q. And when was that?

19  A. I left some time in '93.

20  Q. Why did you leave?

21  A. Because I was going to graduate

22 school again.

23  Q. And what was your position at Loe

24 and Mahon or whatever it was?

00030
1    A.  I was an associate attorney.
2    Q.  In what area of specialty?
3    A.  Art law.
4    Q.  And prior to that where did you
5  work?
6    A.  Prior to that I was in law school.
7  I had several jobs while I was in law school. I
8  don't know.
9
10         (Defendants' Exhibit A,
11          RESUME, was marked for
12          identification.)
13
14   Q.  I show you what's been marked as
15  Defendants' Exhibit A for identification. Can
16  you identify the document?
17   A.  It's a resume.
18   Q.  Whose?
19   A.  Mine.
20   Q.  Who prepared it?
21   A.  Me.
22   Q.  Did you prepare it?
23   A.  I guess.
24   Q.  Well, I don't want you to guess.

00031
1 Take a look at it.

2    A. Yes.

3    Q. Yes, you prepared it?

4    A. Yes, I believe so, yes.

5    Q. Is that a true and accurate resume?

6    A. I believe so.

7    Q. Let me rephrase that. Is everything
8 that you put down here true and accurate?

9    A. I believe so.

10    Q. Okay. You mentioned --

11    MS. PERATIS: Before you ask a
12 question.

13

14 (Discussion held off the record.)

15

16 MR. WEBER: Well -- I'm going to
17 object if you're going to direct the
18 witness one way or another.

19 MS. PERATIS: No, I'm not directing
20 the witness at all.

21 MR. WEBER: It's inappropriate for
22 you to have discussions with her during a
23 deposition.

24 MS. PERATIS: Well, when a

EXHIBIT C

LAW OFFICES OF Paul A. Mahon, Chartered                1099's

|    | A        | B     | C      | D        | E         |
|----|----------|-------|--------|----------|-----------|
| 1  |          |       |        |          |           |
| 2  |          |       |        |          |           |
| 3  |          |       |        |          |           |
| 4  | Date     | Check | MH     | SS       | AF        |
| 5  | ———      | ———   | ———    | ———      | ———       |
| 6  | 2/10/93  | 108   | 100.00 |          |           |
| 7  | 2/18/93  | 113   |        |          | 75.00     |
| 8  | 2/26/93  | 122   |        |          | 110.00    |
| 9  | 3/12/93  | 134   |        |          | 190.00    |
| 10 | 3/12/93  | 135   | 150.00 |          |           |
| 11 | 3/19/93  | 138   | 100.00 |          |           |
| 12 | 3/19/93  | 139   |        |          | 130.00    |
| 13 | 3/26/93  | 145   |        |          | 160.00    |
| 14 | 4/2/93   | 151   |        |          | 125.00    |
| 15 | 4/17/93  | 159   |        |          | 250.00    |
| 16 | 4/22/93  | 174   |        |          | 160.00    |
| 17 | 4/22/93  | 176   | 150.00 |          |           |
| 18 | 5/7/93   | 181   |        |          | 305.00    |
| 19 | 5/14/93  | 195   | 200.00 |          |           |
| 20 | 6/3/93   | 204   | 203.00 |          |           |
| 21 | 6/11/93  | 208   |        | 546.00   |           |
| 22 | 6/29/93  | 228   |        |          | 357.00    |
| 23 | 7/9/93   | 239   |        |          | 393.75    |
| 24 | 7/9/93   | 240   |        | 840.00   |           |
| 25 | 7/23/93  | 249   |        |          | 400.00    |
| 26 | 7/23/93  | 250   |        | 545.00   |           |
| 27 | 8/7/93   | 266   |        |          | 623.00    |
| 28 | 8/20/93  | 289   |        |          | 1000.00   |
| 29 | 9/2/93   | 301   |        |          | 567.00    |
| 30 | 9/20/93  | 321   |        |          | 584.50    |
| 31 | 10/1/93  | 327   |        |          | 700.00    |
| 32 | 10/14/93 | 348   |        |          | 687.50    |
| 33 | 10/29/93 | 355   |        |          | 930.00    |
| 34 | 11/12/93 | 385   |        |          | 675.00    |
| 35 | 11/30/93 | 400   |        |          | 553.50    |
| 36 | 12/20/93 | 429   |        |          | 773.50    |
| 37 | 12/30/93 | 450   |        |          | 721.00    |
| 38 |          |       | ———    | ———      | ———       |
| 39 |          |       | 903.00 | 1,931.00 | 10,470.75 |
| 40 |          |       |        |          |           |
| 41 |          |       |        |          |           |

PMO(

## Check 176

**PAUL A. MAHON, CHARTERED**
1735 CONNECTICUT AVE., N.W., THIRD FLOOR
WASHINGTON, D.C. 20009

Date: 4/22/1993

Pay to the order of: Mary Hopkins

$150.00

One Hundred Fifty and 00/100 DOLLARS

RIGGS — The Riggs National Bank of Washington, DC, Dupont Circle Office

## Check 195

**PAUL A. MAHON, CHARTERED**
1735 CONNECTICUT AVE., N.W., THIRD FLOOR
WASHINGTON, D.C. 20009

Date: 5/14/1993

Pay to the order of: Mary Hopkins

$200.00

Two Hundred and 00/100 DOLLARS

RIGGS — The Riggs National Bank of Washington, DC, Dupont Circle Office

## Check 204

**PAUL A. MAHON, CHARTERED**
1735 CONNECTICUT AVE., N.W., THIRD FLOOR
WASHINGTON, D.C. 20009

Date: 6/2/1993

Pay to the order of: Mary Hopkins

$203.00

Two Hundred Three and 00/100 DOLLARS

RIGGS — The Riggs National Bank of Washington, DC, Dupont Circle Office

| Check # | Date | Pay to | Amount |
|---|---|---|---|
| 176 | 4/22/93 | Mary Hopkins | $150.00 — One Hundred Fifty and 00/100 |
| 195 | 5/14/93 | Mary Hopkins | $200.00 — Two Hundred and 00/100 |
| 204 | 6/2/93 | Mary Hopkins | $203.00 — Two Hundred Three and 00/100 |

All checks drawn on: PAUL A. MAHON, CHARTERED, 1735 Connecticut Ave., N.W., Third Floor, Washington, D.C. 20009 — Riggs National Bank of Washington, DC, Dupont Circle Office.

LAW OFFICES
# MAHON & PATUSKY
CHARTERED

PAUL A. MAHON
D.C., N.Y., MASS. AND ILL. BARS

CHRISTOPHER PATUSKY
MASS. BAR

1735 CONNECTICUT AVENUE, N.W., THIRD FLOOR
WASHINGTON, D.C. 20009
TEL. (202) 483-4000
FAX (202) 483-4006

19 WEST 21ST STREET, SUITE 901
NEW YORK, N.Y. 10010

11 TUCKERNUCK AVENUE
POST OFFICE BOX 1695
OAK BLUFFS, MASS. 02557

May 25, 1995

Ref: MARY ROZELL HOPKINS

Dear Sir or Madam:

I am delighted to provide a recommendation on behalf of Mary Rozell Hopkins' application for a full-time professorship. I have known Ms. Hopkins since 1989 when she began working with my firm as an art attorney, representing United States and international artists, galleries, collectors and museums. I have the absolute highest regard for Ms. Hopkins' abilities, professionalism, intelligence and her wonderful manner with people. As important is the fact that she has more common sense than almost anyone I know. She is an independent thinker who tackles problems head on, proposing innovative and effective solutions.

In our law practice, I came to rely on Ms. Hopkins as an alter ego. She routinely handled challenging matters, often of the utmost delicacy. I have always been impressed with her thinking and insights into the issues and admired the way that she analyzed options and alternatives. She also worked extremely well with our clients and others in the office to get the job done in an effective, complete and pleasant way. These qualities will make her a terrific professor. And her students will certainly benefit from Ms. Hopkins' practical experience as an art lawyer.

It is important for you to understand the nature of her work at our firm and the diversity of the matters she handled in order to appreciate Ms. Hopkins' extensive experience in the practice of art law:

- <u>Contracts</u>. Ms. Hopkins negotiated and drafted commission agreements for several of our internationally prominent artists for major public commissions. She negotiated commissions with a total value of just over $1 million, resolving a number of difficult issues and overcoming several impasses

MAHON & PATUSKY
CHARTERED

in the process. These deals typically involve a number of moving parts and Ms. Hopkins deftly concluded the negotiations. She also handled a number of transactional matters for several of our big clients, including Sygma, the world's largest photo agency, and Magnet Interactive Studios, now the world's largest interactive multimedia studio. Ms. Hopkins was also responsible for the preparation and negotiation of a number of limited partnerships and other financing vehicles to invest in artwork.

- <u>Alternative Dispute Resolution</u>. Ms. Hopkins often obtained strong results for our clients outside of the courtroom. She was particularly helpful in our federal estate tax negotiation involving $85 million in artwork in the estate of one of New York's most prominent art dealers. The estate was complicated by the fact that it included a great number of masterpieces that had been purchased directly from the artists in the 1920's through the 1950's. It was a remarkable collection and Ms. Hopkins provided great insights into the body of work that greatly reduced the estate's tax burden. In another case, a client was sued for misrepresenting the attribution of authorship of an important 17th Century Dutch painting. Although the matter was headed for trial, Ms. Hopkins engineered a terrific example of alternate dispute resolution. Having first convinced the other side, she organized an impartial mediation through the presentation of each side's position to a neutral art authority along with an inspection of the work at issue. The authority inspected the painting and ruled in our favor. Ms. Hopkins similarly obtained a wonderful resolution on behalf of a museum curatorial service in a dispute with one of its host museums involving the tour of a prominent Middle Eastern museum collection.

- <u>Litigation</u>. Although we try to resolve disputes without recourse to the courts, Ms. Hopkins was particularly successful in assisting us in litigation. One case concerning the valuation of an important Picasso painting turned on her analysis of the artworks at issue and the expert testimony of Sotheby's and Christie's. In another case, we obtained a judgment of $850,000 against a

2

PMO(

**MAHON & PATUSKY**
CHARTERED

*NOVA LAW REVIEW* SYMPOSIUM ON LAW AND THE VISUAL ARTS, covering moral rights, the protection of artists, the business of art and the philosophy of law and art. She also assisted with our section in the second edition of *THE BUSINESS OF ART*, edited by Lee Caplin and published in cooperation with the National Endowment for the Arts.

I have outlined Ms. Hopkins' important contributions to our firm to demonstrate her first rate legal experience with artistic issues. She brings to the classroom her comprehensive knowledge of the way the art world actually works. The insights she has gained from her legal experience nicely complement her scholarship and will make her an ideal full professor. What consistently impressed me most about Ms. Hopkins was the intellectual vigor with which she attacked her work. That she has chosen to apply this ability to an academic career is not surprising to me in that a career limited to the practice of law would have been an underutilization of her capabilities. We are delighted that she has chosen to serve as an educator and we are confident that Ms. Hopkins will be a most valuable asset to the University and its students.

Please let me know if I may be of further assistance.

Sincerely,

Paul A. Mahon