1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - -X
MARY ROZELL,

                Plaintiff,

    -against-          Index No.
                        05CV 2936

COURTNEY ROSS-HOLST, an individual,
Andco, LLC, a corporation, and NEIL
PIROZZI, an individual,

                Defendants.
- - - - - - - - - - - - - - - - - - - -X
                February 1, 2006
                10:10 a.m.

DEPOSITION of MARY ROZELL, the Plaintiff herein,
taken pursuant to Notice, and held at the offices
of Littler Mendelson, P.C, 885 Third Avenue, New
York, New York, before Debra A. Levinson,
CSR-RMR-CRR, a Court Reporter and Notary Public
of the State of New York.



DALCO REPORTING, INC.
170 Hamilton Avenue, White Plains, New York 10601
49 W. 37th Street, New York, New York 10018
914.684.9009 Fax 914.684.6561 800.DAL.8779
212.679.6095 www.dalcoreporting.com

---

MARY ROZELL

2

APPEARANCES:

    OUTTEN & GOLDEN, LLP
        Attorneys for Plaintiff
        3 Park Avenue
        New York, New York 10016
    BY:  KATHLEEN PERATIS, ESQ.
           -and-
        MARK R. HUMOWIECKI, ESQ.


    LITTLER MENDELSON, P.C.
        Attorneys for Defendants
        885 Third Avenue
        New York, New York 10022-4834
    BY:  A. MICHAEL WEBER, ESQ.
           -and-
        ELENA PARASKEVAS-THADANI, ESQ.


ALSO PRESENT:
    NEIL PIROZZI

---

MARY ROZELL

3

    IT IS HEREBY STIPULATED AND AGREED by and
between the attorneys for the respective parties
herein, that filing and sealing be and the same
are hereby waived.

    IT IS FURTHER STIPULATED AND AGREED that
all objections, except as to the form of the
question, shall be reserved to the time of the
trial.

    IT IS FURTHER STIPULATED AND AGREED that
the within deposition may be signed and sworn to
before any officer authorized to administer an
oath, with the same force and effect as if signed
and sworn to before the Court.

---

MARY ROZELL

4

1    MARY ROZELL,
2        having been first duly sworn by the
3        Notary Public (Debra A. Levinson),
4        and stating her address as 226 Front
5        Street, New York, New York 10038,
6        was examined and testified as
7        follows:
8
9        MR. WEBER:  Good morning.
10       MS. PERATIS:  Good morning.
11
12   EXAMINATION BY
13   MR. WEBER:
14      Q.  Ms. Rozell, my name is Michael
15   Weber. We've met before you may recall?
16      A.  Uh-hum.
17      Q.  I'm going to ask you a number of
18   questions today which the court reporter will
19   take down. It's important that you answer your
20   questions verbally so we get a clear answer, and
21   if you don't understand any question I ask you,
22   please let me know and I'll rephrase it or
23   restate it.
24        In a deposition like this you're

MARY ROZELL
301

(Defendants' Exhibit BBB,
E-MAIL, was marked for
identification.)

Q. I show you Defendants' BBB for identification. Can you tell me what that is?
A. We did this already, didn't we?
Q. I wasn't sure.
A. We did.
Q. Let's then take that back and forget we did it.
MS. PERATIS: Are you withdrawing it?
MR. WEBER: I am. I thought we did it also.

(Defendants' Exhibit BBB,
E-MAIL, was remarked for
identification.)

Q. I show you what's been marked Defendants' Exhibit BBB. Can you identify it?
A. This is an e-mail from Tasha to me.

MARY ROZELL
302

(Defendants' Exhibit CCC,
E-MAIL, was marked for
identification.)

Q. Defendants' Exhibit CCC, can you identify it, two pages?
A. Didn't we do this as well?
Q. I don't believe so.
A. I thought we did.
This is an e-mail from me to Tasha.
Q. Okay.

(Defendants' Exhibit DDD,
PAGES FROM DIARY, was marked
for identification.)

Q. I show you DDD for identification. Tell me what that is.
A. These are two pages from my journals.
Q. What journals are you referring to?
A. Personal journals.
Q. How many do you have?

MARY ROZELL
303

A. How many do I have? From my whole life?
Q. No, for the last two years.
A. From the last two years.
Q. Excuse me, since 2002.
A. Since 2002, I think I have two.
Q. Are these --
A. I think these are --
Q. Tell me what your journals are.
A. One journal is more or less written for my child, chronically, his first year of life and before, I think that's what this is taken from.
Q. Right. And the other?
A. Another one is more of a general journal that is primarily a chronicle of my mother's disease and some travel.
Q. Does she have Alzheimer's?
A. She did, yeah.
Q. Sorry. My mother did as well.
MS. PERATIS: My mother's getting it.

(Discussion held off the record.)

MARY ROZELL
304

Q. Did you ever see a therapist by the name of Nelson?
A. Yes.
Q. And who is that?
A. He was a couples' therapist.
Q. And I assume you went with your husband?
A. Yes.
Q. And did you have any dispute with your husband concerning a certain person named Catherine?
A. Yes.
Q. And who is that?
A. It's an old family friend of his.
Q. One he had a relationship with?
A. I think so, 20 years ago or something.
Q. And what's the dispute about?
MS. PERATIS: What's that got to do with this case, Michael?
MR. WEBER: Has to do with claims for emotional damage and what may have had an impact.

MARY ROZELL
273

1   A.   No.
2   Q.   Do you believe that the decision to
3   terminate your employment was based on your
4   complaint to Ms. Ross-Holst?
5   A.   I do.
6   Q.   What do you base that on?
7   A.   I base that on the fact that I don't
8   believe there was another reason to terminate me.
9   Q.   Anything else?
10  A.   Course of events from the time I
11  reported -- I spoke with Mrs. Holst's, to the
12  time I was fired.
13  Q.   The course of events that you
14  described --
15  A.   Uh-hum.
16  Q.   -- earlier today?
17  A.   Uh-hum.
18  Q.   Anything else?
19  A.   I don't think so. I'm not sure.
20  Q.   Do you know if Ms. Ross-Holst or Mr.
21  Halpern ever spoke to Mr. Pirozzi about your
22  complaint?
23  A.   I don't know.
24  Q.   Anybody ever tell you that they did?

MARY ROZELL
274

1   A.   No.
2
3            (Defendants' Exhibit WW,
4            E-MAIL, was marked for
5            identification.)
6
7            (Defendants' Exhibit XX,
8            E-MAIL, was marked for
9            identification.)
10
11  Q.   I show you Defendants' Exhibit WW
12  for identification. Did you ever see that
13  document before, two-page document, two e-mails?
14  A.   What was the question again? Do I
15  recognize it?
16  Q.   Yes.
17  A.   Yes.
18  Q.   These are your e-mails?
19  A.   Yes.
20  Q.   Did you ever tell anybody you were
21  going to write a tell-all book?
22  A.   No.
23  Q.   Did you discuss with anybody about a
24  consulting -- your consulting aspirations?

MARY ROZELL
275

1   MS. PERATIS: When?
2   MR. WEBER: 2004.
3   A.   2004, probably.
4   Q.   With whom?
5   A.   People that I would talk to about
6   what I was going to do next.
7   Q.   I show you what's been marked
8   Defendants' Exhibit XX, can you identify it?
9   A.   This is an e-mail from me to Bettina
10  Sulser.
11  Q.   Is that your handwriting on that
12  document?
13  A.   Yes.
14
15           (Defendants' Exhibit YY,
16           E-MAIL, was marked for
17           identification.)
18
19  Q.   I show you Defendants' Exhibit YY.
20  Can you identify that document?
21  A.   This is an e-mail from me to the
22  same automaton expert.
23  Q.   Okay. Prior to your termination
24  from Andco, were you ever looking for another job

MARY ROZELL
276

1   while employed by Andco?
2   A.   I think I sent off a job application
3   while I was there.
4   Q.   Do you remember when?
5   A.   I think it was some time in 2004.
6   Q.   To whom did you send the
7   application?
8   A.   To Skidmore College.
9   Q.   What position were you seeking?
10  A.   Director of the art museum.
11  Q.   Approximately when did you send
12  that? I know you said 2004. Can you give me a
13  better --
14  A.   Some time, well, the letter's in my
15  computer, so it would have the exact date.
16  Q.   Sometime prior to end of April,
17  2004?
18  A.   Yes.
19  Q.   And did you hear back from Skidmore?
20  A.   Yes.
21  Q.   And what did they say?
22  A.   I didn't get the job.
23  Q.   Did you seek any other employment
24  prior to the end of April 2004 while you were

MARY ROZELL
293

Q. You said you were going to set up or you did set up?
A. Well, I set it up informally.
Q. And you prepared this document?
A. Yes.
Q. Have you sent this to anyone in connection with trying to find employment or provide services?
A. I sent it to the Grunebaums. And I believe Bettina sent it to people.
Q. Do you know to whom?
A. No.
Q. Is Sasha still involved with this entity?
A. Tasha?
Q. Tasha, I'm sorry.
A. Yes, somewhat. She has another job but she works with me on the Grunebaum collection when she can.
Q. Have you mentioned all the opportunities so far that you've pursued to find employment?
A. I'm not sure if I've mentioned them all.

MARY ROZELL
294

Q. Do you want to think a minute and see if you can recall anything else?
A. Did I mention my meeting with Benedict Taschen?
Q. No. Who's that?
A. He's the founder, owner of Taschen, T-A-S-C-H-E-N, Publishing.
Q. And who is Benedict Taschen?
MS. PERATIS: One second, Michael. Would you read that back.

(The requested testimony was read back.)

A. He had wanted to meet me for a while and, and I had interviewed with his company when I first came to New York and the person who interviewed me always stayed in touch with me, and at some point she said Benedict would like to meet you and it just so happened we were in the same city at the same time so we met in Berlin.
Q. Did you pursue anything in particular or just to network?
A. I think it was just networking. He

MARY ROZELL
295

was -- I think his right hand person liked me and thought I was a good fit for the company and he asked me a lot of questions but I never heard from him. My baby was at the interview so I don't think that helped but --
Q. Never know.
Any other efforts to find employment or work?
A. There probably are, I just can't remember.
Q. Think a minute and see if you can remember.
A. I just did that. It's an ongoing process. I had a meeting with Andy Spade.
Q. Of the Kate Spade fame?
A. (Indicating yes.)
Q. What position?
A. It wasn't a position. It was just to pitch our little --
Q. Business?
A. Business.
Q. To take care of their art?
A. Uh-hum.
Q. And what transpired with that?

MARY ROZELL
296

A. Bettina ended up working there on her own because she didn't want to work with me.

(Discussion held off the record.)

(Recess taken.)

(Defendants' Exhibit AAA,
E-MAIL, was marked for
identification.)

BY MR. WEBER:
Q. Have you been doing any writing since April of '04?
A. Yes.
Q. What kind of writing?
A. I've been working on books and writing a proposal that I hope will be expanded into more of a scholarly essay on the collection, the Grunebaum collection.
Q. What kind of books are you working on?
A. I've been working on a book, a memoir of my time in Berlin and East Germany

after the Wall came down, and I've been working on a fiction novel and a book on Alzheimer's.
   Q. Let's take the first one. What is the first one?
   A. The memoir.
   Q. The memoir.
   A. Uh-huh.
   Q. How far along are you on that? How many pages have you scripted out?
   A. I don't know how many pages. There's different -- different sections. I guess maybe around 50.
   Q. And that covers what period of time?
   A. It covers -- it starts in '92. It's not chronological. It's not in the order yet. It's just little vignettes, through '97 or '98.
   Q. Have you talked with a publisher about possibly doing something there?
   A. No.
   Q. The fiction novel, how far are you along on that?
   A. I have about 50,000 words.
   Q. Wow. And what's that about?
   A. That's about -- the theme is about

reassimilation into one's own country, and it's kind of a -- it's a comparison of the cultural values of Europe and America. It's a little bit of a travel log. It takes place in Europe, in the United States, and it's a lot about art and the art world.
   Q. And you started that in '04?
   A. I started that in January of '04.
   Q. And have you talked with a publisher about that book?
   A. No.
   Q. Do you have an agent for that book?
   A. No.
   Q. Then you have a third thing you're working on I think?
   A. Alzheimer's.
   Q. A book on Alzheimer's, and how far along are you on that?
   A. That book's been ongoing -- if you can call it a book it's not a book, it's just writing. That's been going on for many years now. I have, I don't know how many words or pages. I guess maybe 50 to a hundred pages.
   Q. Any agent or publisher in connection

with that?
   A. No.
   Q. Did you ever mention the fiction book to anybody at Andco?
   A. No. I didn't start it until after I left there.
   Q. Are you covered by your husband's health insurance?
   A. I am now, yes.
   Q. And he still works at Random House?
   A. Yes.
   Q. What's his title there?
   A. I don't know what it is, senior vice president or something.
   Q. When did you start seeing a psychologist?
   A. I think it was January of 2005.
   Q. And did you do so at the direction or suggestion of your attorneys?
   A. No, not at that point.
   Q. Did you ever tell your therapist that you are, were in therapy at the direction of your attorneys?
   A. My attorneys asked me if I was in

therapy in the beginning when I first saw --
       MS. PERATIS: No, you don't talk
   about that. Sorry, I was just listening.
   I was getting interested in the whole
   story.
       MR. WEBER: Compelling story and you
   didn't realize it was attorney-client.
       MS. PERATIS: Yes, please strike the
   entire answer.
   Q. Without telling me what you said to your attorneys and what your attorneys said to you did you tell your therapist that you were going to therapy at the suggestion of your attorney?
   A. I think what I told my therapist that my attorney had suggested it a long time ago.
   Q. Are you seeing a therapist now?
   A. No.
   Q. When did you stop?
   A. I stopped last -- I think it was May of 2005.
   Q. And you started in January of '05?
   A. Yeah -- yes.

MARY ROZELL
93

1  A. I'm not sure. I'm guessing.
2  MS. PERATIS: Don't guess.
3  A. Okay, all right.
4  Q. If someone went into the lobby on
5  71st Street to go directly to the 12th or 13th
6  floor, would they be required to go to Carrie on
7  the first floor office?
8  A. That's what we tried to establish
9  but that was not always the case.
10 Q. How did you try to establish that?
11 A. By setting up the system with
12 Carrie, I spoke with the doorman, and just
13 basically spoke to the staff about trying to --
14 Q. Did you speak to the doormen?
15 A. Yes.
16 Q. What did you tell them?
17 A. I told them that they needed to send
18 people to the first floor offices and not
19 directly to the apartment.
20 Q. Did they follow your instructions?
21 A. I'm not sure if they always did.
22 Q. Did you ever follow up on it?
23 A. Yes.
24 Q. What did you learn?

MARY ROZELL
94

1  A. Well, I had a conversation with them
2  about access to the apartment because of
3  Nicole's, Mrs. Holst's daughter's boyfriend and
4  other friends. They did not feel that they --
5  also there was the issue of after hours when no
6  one was there. And it was brought to my
7  attention that Nicole's boyfriend was coming in,
8  bringing other people in, when no one else was
9  there, and they asked me if I could help them to
10 set up a system. And I told them I would try to
11 get a list of names for them of who was allowed
12 access to the apartment so that it would take the
13 pressure off of them.
14 Q. Okay.
15
16    (Defendants' Exhibit O,
17    E-MAIL, was marked for
18    identification.)
19
20 Q. I show you Defendants' Exhibit O for
21 identification. Tell me what that is.
22 A. This is an e-mail from me to Tasha.
23 Q. And what were you saying here?
24 A. They were e-mails that she wrote to

MARY ROZELL
95

1  me about what was going on in the office.
2  Q. Do you have those e-mails that she
3  sent you?
4  MS. PERATIS: We've given you
5  whatever she has.
6  MR. WEBER: I'll ask the witness.
7  A. Yeah, whatever --
8  Q. Did you keep the e-mails she sent
9  you?
10 A. Whatever was taken from my computer
11 are preserved.
12 Q. So you have the e-mail to which she
13 responded to here?
14 A. I'm not sure if I have that exact
15 e-mail. The e-mails that we have are the ones
16 that were stolen from my computer.
17 Q. I'm asking you a different question.
18 A. I don't -- and I'm saying I don't
19 know. I don't know the exact --
20 Q. Do you have the computer from which
21 this was sent in --
22 A. Do I have that computer?
23 Q. Yes.
24 A. Yes, we have that computer.

MARY ROZELL
96

1  Q. Is that a laptop?
2  A. No.
3  Q. Is it a desktop?
4  A. It's a desktop.
5  Q. What kind of computer is it?
6  A. It's a Mac.
7  Q. When did you get it?
8  A. I think, it's my husband's. I think
9  he got it maybe in 2003. Not sure.
10 Q. And you've used that to communicate
11 with Sasha?
12 A. At that time, yes.
13 Q. And currently?
14 A. No, I don't use that computer. I
15 got my own computer.
16 Q. When did you get your own computer?
17 A. I got my own computer after I was
18 fired. I think it was August. It was August of
19 2004.
20 Q. And do you still have that computer?
21 A. Yes, I do.
22 Q. What kind of computer is that?
23 A. It's a Sony Vio laptop.
24 MR. WEBER: I'm going to direct that

MARY ROZELL
97

1  both those computers be preserved that
2  nothing be deleted from them that we'll
3  seek appropriate discovery to get the
4  corresponding e-mails to the ones that you
5  were looking at here.
6
7  DOCUMENT/INFORMATION REQUESTED:
8
9       Q.   You say just got these last e-mails
10 this morning.
11      A.   Uh-hum.
12      Q.   What is that referring to?
13      A.   E-mails that she sent me from the
14 office the day before or -- yeah.
15      Q.   The reference, "Bill," I assume is
16 your husband?
17      A.   Uh-hum.
18      Q.   Raised his beer bottle for a toast
19 quote, to agent T, end of quote. What is that
20 referring to?
21      A.   That refers to Tasha having to sneak
22 around to get my personal belongings.
23      Q.   So at this point she's still looking
24 for your personal belongings?

MARY ROZELL
98

1       A.   At that point when the e-mail was
2  written?
3       Q.   Correct.
4       A.   No, she was not there.
5       Q.   She wasn't there May 1?
6       A.   That was a Saturday.
7       Q.   I don't mean physically that day. I
8  mean was she employed at Andco at the time?
9       A.   I believe she was still employed
10 there.
11      Q.   Did there come a point when you were
12 told that she couldn't get your personal
13 belongings?
14      A.   There was a point where I told her
15 to just forget it.
16      Q.   When was that?
17      A.   Towards the end of that Friday.
18      Q.   What day was that?
19      A.   What was the date?
20      Q.   Uh-hum.
21      A.   April 28th -- is it the 30th? I
22 don't have a calendar.
23
24           (Defendants' Exhibit P,

MARY ROZELL
99

1            E-MAIL, was marked for
2            identification.)
3
4       Q.   I show you what's been marked
5  Defendants' Exhibit P. Can you identify that
6  document?
7       A.   It's an e-mail from me to Tasha on
8  the Monday after I was fired.
9       Q.   Who's Paul?
10      A.   Paul Asenbaum is an art consultant
11 in Vienna.
12      Q.   You spoke to him?
13      A.   I did.
14      Q.   What did you say to him?
15      A.   I was working closely with him at
16 the time and I called him to tell him that I lost
17 my job. I told him I was fired.
18      Q.   Anything else you tell him?
19      A.   I don't think so.
20      Q.   You also say I also spoke with
21 Shawn.
22      A.   Uh-hum.
23      Q.   What did you say to Shawn?
24      A.   Oh, I don't remember speaking with

MARY ROZELL
100

1  Shawn but I assume I was asking him about my
2  documents.
3       Q.   And was Shawn employed by Andco at
4  the time?
5       A.   No.
6       Q.   Was he an independent IT person?
7       A.   Yes.
8       Q.   What did he say to you?
9            MS. PERATIS: If you recall.
10      A.   I don't recall. I can just
11 interpret from what he, what I wrote here.
12      Q.   How were you able to reach him?
13      A.   I don't remember.
14
15           (Defendants' Exhibit Q,
16           E-MAIL, was marked for
17           identification.)
18
19      Q.   I show you Defendants' Q for ID,
20 identify that document.
21           MS. PERATIS: Do you have a
22 question?
23      Q.   Can you identify it?
24      A.   It's an e-mail from me to Tasha, and