LITTLER MENDELSON, P.C.
A. Michael Weber (AW-8760)
Michael P. Pappas (MP-6716)
Elena Paraskevas-Thadani (EP-7758)
885 Third Avenue
New York, New York 10022
(212) 583-9600

Attorneys for Defendants

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

MARY ROZELL,

          Plaintiff,

     -against-

COURTNEY ROSS-HOLST, an individual,
ANDCO, LLC, a corporation, and NEIL
PIROZZI, an individual,

          Defendants.

05 CV 2936 (JGK) (JCF)

**DEFENDANTS' RULE 56.1**
**STATEMENT OF UNDISPUTED FACTS**

---

Pursuant to Local Civil Rule 56.1, Defendants, by their attorneys, Littler Mendelson,

P.C., hereby state the following facts as to which there is no genuine issue to be tried:[1]

    1.    Plaintiff resided at 50 West 9th Street in Manhattan from April 2000 to August

2004.  (Deposition of Mary Rozell ("Rozell Dep.") at 12.)[2]

    2.    Plaintiff is a high school and college graduate.  (Rozell Dep. at 18.)

    3.    Plaintiff has a Master's Degree in Art History from the Courtauld Institute in

London.  (Rozell Dep. at 18-19.)

---

[1]    The facts set forth herein are undisputed for purposes of Defendants' motion for summary judgment only, and should not be construed as admissions or stipulations of fact with respect to any other part of this action.

[2]    Deposition excerpts and exhibits cited herein and in Defendants' Memorandum of Law are annexed to the Declaration of Michael P. Pappas dated August 31, 2006 ("Pappas Decl."), submitted herewith.

4.      Plaintiff is an attorney and is admitted to practice in California and Washington, D.C.  (Rozell Dep. at 18, 28-30.)

5.      Plaintiff's husband is an attorney.  (Rozell Dep. at 17.)

6.      Plaintiff is fluent in several languages.  (Rozell Dep. at 18-19, 25-28.)

7.      Plaintiff's work experience prior to her employment at Andco is as indicated on the resume marked and identified as Exhibit A to her deposition.  (Rozell Dep. at 30-31, Exh. A.)

8.      Plaintiff commenced employment with Andco, LLC ("Andco") in September 2001.  (Rozell Dep. at 52.)

9.      Prior to commencing employment with Andco, Plaintiff and Andco entered into the Non-Disclosure Agreement marked and identified as Exhibit I to her deposition.  (Rozell Dep. at 48, Exh. I.)

10.      Plaintiff's job title at Andco was Director of Art Collection and Cultural Affairs. (Rozell Dep. at 54-58, 66, Exhs. J, K.)

11.      Plaintiff's job duties as Andco's Director of Art Collection and Cultural Affairs were as described in Paragraph 21 of the Complaint.  (Complaint, ¶ 21.)

12.      At all relevant times, Courtney Ross was the principal owner of Andco. (Deposition of Courtney Ross ("C. Ross Dep.") at 39-40.)

13.      Plaintiff initially reported to Courtney Ross and Catherine Stanke, the Family Office Manager.  After Catherine Stanke's employment with Andco ceased, Plaintiff reported solely to Mrs. Ross.  (Rozell Dep. at 53, 58-59, 121.)

14.      Plaintiff was responsible for supervising a staff of 2 employees, including an archivist and a collections coordinator.  (Rozell Dep. at 61-64.)

15.     From the time of her hire until approximately mid-2002, Plaintiff worked at Andco's offices on East 57th Street in Manhattan.  (Rozell Dep. at 65-66, 310-11, Exh. EEE.)

16.     From approximately mid-2002 until her discharge, Plaintiff worked at Andco's main office and Courtney Ross's residence, which were located in the same building on East 71st Street in Manhattan.  (Rozell Dep. at 86-89.)

17.     At all relevant times, Neil Pirozzi was the Chief Financial Officer of Andco. (Rozell Dep. at 138.)

18.     Neil Pirozzi was hired by Andco in or about October 2002.  (Rozell Dep. at 137, 150; Complaint, ¶¶ 23-24.)

19.     Neil Pirozzi's office was in East Hampton, Long Island.  (Rozell Dep. at 146; Deposition of Neil Pirozzi ("Pirozzi Dep.") at 19.)

20.     Neil Pirozzi would visit Andco's offices in Manhattan approximately 2-3 times a month.  (Rozell Dep. at 86, 142, 146; Pirozzi Dep. at 19, 23, 83, 96, 195; Deposition of Tasha Seren ("Seren Dep.") at 34.)

21.     Plaintiff did not report to Neil Pirozzi, and he was not one of her supervisors. (Rozell Dep. at 121, 151; Pirozzi Dep. at 21, 36-37, 40, 71.)

22.     Plaintiff first met Neil Pirozzi in October 2002.  (Rozell Dep. at 137, 150; Complaint, ¶¶ 23-24.)

23.     Plaintiff alleges that in her first meeting with Neil Pirozzi in October 2002, he said "something about my body, about my having a nice body."  (Rozell Dep. at 150.)  Plaintiff described the meeting as otherwise cordial.  (Id. at 139-40, 150.)

24.     Plaintiff did not report Neil Pirozzi's alleged comment to Andco management at the time.  (Rozell Dep. at 149-52.)

3

25.    In November 2002, Plaintiff went out on medical/maternity leave, and did not return to work at Andco's offices until April 2003. (Rozell Dep. at 126-28.)

26.    When Plaintiff returned from medical/maternity leave in April 2003, she requested to work part-time, and Andco granted her request. Thereafter, Plaintiff came to work at Andco's offices three days a week. (Rozell Dep. at 129-31.)

27.    Plaintiff alleges that, after she returned from leave in April 2003, Neil Pirozzi would usually visit her office when he was in the City. (Seren Dep. at 34-35.)

28.    Plaintiff alleges that, during Neil Pirozzi's visits to her office, he would sometimes "tell me I looked great, tell me I had a great body, things like that." (Rozell Dep. at 152.).

29.    Plaintiff did not report those alleged comments to Andco management at the time. (Rozell Dep. at 149, 154.)

30.    Plaintiff and Neil Pirozzi would also engage in conversation about travel, art, their children, and other non-work-related matters. (Rozell Dep. at 157-61.)

31.    Plaintiff alleges that Neil Pirozzi would occasionally complain about his wife to Plaintiff and others. Specifically, he "would tell us how he slept on the couch, and he kind of painted a picture of resentment about his wife not working, him having to pay all the bills, that sort of thing." (Rozell Dep. at 160, 162-63.)

32.    Plaintiff alleges that she was "a little offended" by Neil Pirozzi's comments about his wife. (Rozell Dep. at 162.)

33.    Plaintiff did not report those alleged comments to Andco management at the time. (Rozell Dep. at 149.)

4

34.     Plaintiff alleges that, on two occasions, Neil Pirozzi walked with her to the subway and put his hand on her waist as they said goodbye. (Rozell Dep. at 187-88; Seren Dep. at 39-40.)

35.     Plaintiff considered it "slightly offensive" that Neil Pirozzi walked with her to the subway on two occasions. (Rozell Dep. at 187.)

36.     Plaintiff did not report that alleged conduct to Andco management at the time. (Rozell Dep. at 188.)

37.     Plaintiff alleges that Neil Pirozzi once greeted her with a hug after the holidays. (Rozell at 189.)

38.     Plaintiff alleges that Neil Pirozzi once kissed her goodnight on the cheek after a company holiday party in December 2003. (Rozell Dep. at 191-94.) Plaintiff "thinks" he was trying to kiss her on the lips, but concedes that he "kind of hit the side of my face." (Id. at 193-94.)

39.     Notwithstanding the above-described conduct, Plaintiff maintained a cordial relationship with Neil Pirozzi. (Rozell Dep. at 160-61.)

40.     In April 2003, Plaintiff told Neil Pirozzi that she was "Looking forward to seeing [him] soon!". (Declaration of Neil Pirozzi dated August 31, 2006 ("Pirozzi Decl."), ¶ 4, Exh. 1.)

41.     In June 2003, Plaintiff sent Neil Pirozzi an e-mail in which she stated, "You bet I'm wondering where you are! : )". (Rozell Dep. at 168-69, Exh. FF; Pirozzi Decl., ¶ 4, Exh. 1.)

42.     In December 2003, Plaintiff told Neil Pirozzi that she "hope[d] to see [him] soon." (Pirozzi Decl., ¶ 4, Exh. 1.)

43.     In January 2004, Courtney Ross's assistant, Krystin McCauley, learned that Plaintiff had told co-workers that Neil Pirozzi tried to kiss her goodnight after the recent office holiday party. (Deposition of Krystin McCauley ("McCauley Dep.") at 184.)

44.     Krystin McCauley told Plaintiff that Courtney Ross would want to speak with her about the incident, and urged Plaintiff to report the incident to Mrs. Ross. (Rozell Dep. at 200-01.)

45.     Plaintiff told Krystin McCauley that she was not sure if she wanted to report the incident to Mrs. Ross. (Rozell Dep. at 201.)

46.     Shortly thereafter, Krystin McCauley told Courtney Ross about Plaintiff's allegation that Neil Pirozzi had tried to kiss her after the firm holiday party. (Rozell Dep. at 202; C. Ross Dep. at 108-09, 111; McCauley Dep. at 191-93, 195, 200-01, 210-11.)

47.     Plaintiff had a good relationship with Courtney Ross. (Rozell Dep. at 86-87, 213.) Plaintiff told her therapist that she and Mrs. Ross had been very close. (Deposition of Elizabeth Arnold ("Arnold Dep.") at 39-40.)

48.     When Courtney Ross learned about Neil Pirozzi's alleged conduct, she was "very concerned" and wanted to deal with it right away. (C. Ross Dep. at 108-09, 111, 275, 280, 293; McCauley Dep. at 198; Deposition of Richard Halperin ("Halperin Dep.") at 23; Seren Dep. at 83-84.)

49.     Although Plaintiff had expressed reluctance to discuss the situation, Courtney Ross, through her assistant Krystin McCauley, encouraged Plaintiff to come forward so that her concerns about Neil Pirozzi could be addressed. (Rozell Dep. at 200-02; Seren Dep. at 83-84; C. Ross Dep. at 108-09; McCauley Dep. at , 191-93, 195, 200-01, 210-11.)

50.     Courtney Ross initiated a meeting with Plaintiff for the purpose of addressing Plaintiff's concerns about Neil Pirozzi's alleged behavior.  (Rozell Dep. at 149, 156, 200-02; C. Ross Dep. at 107-12, 273-75, 280-82, 286-97; Halperin Dep. at 8-23, 30-32, 34-41.)

51.     Prior to the meeting, Courtney Ross sought assistance from an outside advisor, Richard Halperin.   Mrs. Ross told Mr. Halperin that she wanted to confront the problem immediately and was eager to meet with Plaintiff.  (Halperin Dep. at 8-9, 16-20, 23, 28, 30, 36; C. Ross Dep. at 106-09, 111-12, 274-76, 280.)

52.     Prior to the meeting, Courtney Ross and her advisor, Richard Halperin, agreed they would be "responsive, supportive, and do some serious listening." (Halperin Dep. at 28.)

53.     Plaintiff met with Courtney Ross and Richard Halperin on or about January 27, 2004, to discuss Plaintiff's concerns about Neil Pirozzi's alleged behavior.  (Rozell Dep. at 206-09; C. Ross Dep. at 286-90; Halperin Dep. at 30-35.)

54.     When Plaintiff arrived at the meeting, she apologized to Courtney Ross for "taking up her time," and Mrs. Ross responded, "That's okay, I care about you."  (Rozell Dep. at 203, 208.)

55.     At the meeting, Plaintiff was given an opportunity to discuss Mr. Pirozzi's alleged behavior.  (Rozell Dep. at 206-09; C. Ross Dep. at 286-90; Halperin Dep. at 30-35.)  When Mrs. Ross asked Plaintiff what action she wanted the company to take, Plaintiff insisted that she would "handle it herself."  (Rozell Dep. at 209; C. Ross Dep. at 281-82, 288-92; Halperin Dep. at 35-38; Deposition of Elizabeth Arnold ("Arnold Dep.") at 49-50.)

56.     From January 2004 through the end of her employment, Plaintiff was not subjected any further alleged harassment by Neil Pirozzi.  (Rozell Dep. at 149, 154-56, 168.)

57.     Beginning in March 2004 and continuing through April 2004, there were conflicts between two members of Plaintiff's staff, Tasha Seren and Leah Ross, which had escalated to the point where the two were not on speaking terms.  (Rozell Dep. at 183-86; Seren Dep. at 93-94, 99-100, 121-25, 131-32, 135-36; Deposition of Leah Ross ("L. Ross Dep.") at 131-33, 152-74; C. Ross Dep. at 129-34; McCauley Dep. at 38-39, 48-50, 53-54, 163-67; Deposition of Darius Narizzano ("Narizzano Dep.") at 233.)

58.     In April 2004, Tasha Seren informed Neil Pirozzi that she planned to resign because she could no longer work with Leah Ross.  Mr. Pirozzi did not want Ms. Seren to resign, and offered to try to get her a raise.  He also said that he would recommend to Courtney Ross that Leah Ross be discharged.  (Rozell Dep. at 180-82; Seren Dep. at 93-94, 123-25, 130, Exh. TS 11; Pirozzi Dep. at 199-201.)

59.     Shortly thereafter, Neil Pirozzi informed Courtney Ross that Tasha Seren was planning to resign because of dissension in the art department.  (C. Ross. Dep. at 129-31, 170-71.)  Mr. Pirozzi recommended to Mrs. Ross that Leah Ross be discharged.  (Rozell Dep. at 180-82; Seren Dep. at 93-94, 123-25, 130, Exh. TS-11; Pirozzi Dep. at 199-201; C. Ross Dep. at 129-31, 150-51, 170-71.)

60.     Courtney Ross told Neil Pirozzi that she did not want to discharge Leah Ross without knowing more about the situation.  (Pirozzi Dep. at 199-201; C. Ross Dep. at 129-31, 150-51, 170-71.)

61.     After her meeting with Neil Pirozzi, Courtney Ross attempted to learn more about the discord in the art department.  She asked for input from other staff members (Cari Chmiel and Krystin McCauley), who informed Mrs. Ross that: (i) Plaintiff's department was a "dysfunctional mess," and there was "complete dissension"; (ii) Plaintiff and Tasha Seren were

ganging up on Leah Ross and treating her poorly; (iii) Plaintiff complained incessantly about her job and the Ross organization, was unhappy at Andco, and was openly seeking new employment; and (iv) the lion's share of the art department's work was being performed by Seren and Leah Ross, and no one seemed to know what Plaintiff did. (C. Ross Dep. at 128-35, 170-73, 182-83; McCauley Dep. at 37-40, 50, 53-56, 58-62, 69-70, 104-06, 131-32.)

62.    Courtney Ross believed that the discord in the art department reflected poorly on Plaintiff as manager. (C. Ross Dep. at 132-34, 220.)

63.    Courtney Ross believed it was inappropriate for Plaintiff to openly complain to her staff about her job and the company, and to look for other employment in front of her subordinates. (C. Ross Dep. at 132-34, 220.)

64.    Courtney Ross believed that the negative information she received from her staff regarding Plaintiff's work contributions and habits was true. (C. Ross Dep. at 132-33, 173.) Mrs. Ross had previously heard similar concerns about Plaintiff from Darius Narizzano and Marisa O'Neil. (Id. at 122-27, 174-77.)

65.    In the Spring of 2004, Plaintiff was unhappy in her job and openly looking for other employment. (Rozell Dep. at 275-79; L. Ross Dep. at 30-31, 33-39, 71, 133, 186-87; Pappas Decl., Exh. 1.)

66.    In the Spring of 2004, the former head of Andco's art department, Stephen Szczepanek, a highly-regarded employee who had left voluntarily in 2001, sought to return to Andco to work for Courtney Ross. (Rozell Dep. at 35, 46; C. Ross Dep. at 112-19, 133-34, 144-48, 187-88.)

67.    Plaintiff was discharged on April 28, 2004. (Rozell Dep. at 107.)

68.    Courtney Ross made the decision to discharge Plaintiff. (C. Ross Dep. at 88, 134-35, 182, 193-94, 234.)

69.    Courtney Ross never notified Neil Pirozzi about Plaintiff's complaint concerning his alleged inappropriate conduct. (C. Ross Dep. at 88, 134-35, 182, 193-94, 234.)

70.    Courtney Ross gave her staff strict instructions not to notify Neil Pirozzi of Plaintiff's complaint concerning his alleged inappropriate conduct. (McCauley Dep. at 218.)

71.    Neil Pirozzi was not aware of Plaintiff's complaint concerning his alleged inappropriate conduct until after Courtney Ross decided to terminate Plaintiff's employment. (Pirozzi Dep. at 131, 175, 184, 187, 226-27, 312-14.)

72.    Plaintiff does not know who made the decision to discharge her. (Rozell Dep. at 272-74.)

73.    Plaintiff does not know whether Neil Pirozzi was ever notified of her complaint concerning his alleged inappropriate conduct. (Rozell Dep. at 272-74.)

74.    Right after Plaintiff was discharged, she asked Tasha Seren to obtain Andco property for her. (Rozell Dep. at 75.)

75.    Tasha Seren had a Non-Disclosure Agreement with Andco. (Rozell Dep. at 80.)

76.    Plaintiff authored the e-mail marked and identified as Exhibit N to her deposition, and sent it to Tasha Seren at Seren's work computer at Andco's offices. (Rozell Dep. at 85, Exh. N.)

77.    Plaintiff authored the e-mail marked and identified as Exhibit O to her deposition, and sent it to Tasha Seren. (Rozell Dep. at 85, Exh. O.)

78.    Plaintiff authored the e-mail marked and identified as Exhibit Q to her deposition, and sent it to Tasha Seren. (Rozell Dep. at 100-0185, Exh. Q.)

79.    Plaintiff authored the e-mail marked and identified as Exhibit R to her deposition, and sent it to Tasha Seren at Seren's work computer at Andco's offices.  (Rozell Dep. at 102, Exh. R.)

80.    Plaintiff authored the e-mail marked and identified as Exhibit S to her deposition, and sent it to Tasha Seren at Seren's work computer at Andco's offices.  (Rozell Dep. at 104, Exh. S.)

81.    Plaintiff authored the e-mail marked and identified as Exhibit T to her deposition, and sent it to Tasha Seren at Seren's work computer at Andco's offices.  (Rozell Dep. at 106, Exh. T.)

82.    Plaintiff authored the e-mail marked and identified as Exhibit U to her deposition, and sent it to Tasha Seren at Seren's work computer at Andco's offices.  (Rozell Dep. at 108, Exh. U.)

83.    Plaintiff authored the e-mail marked and identified as Exhibit V to her deposition, and sent it to Tasha Seren at Seren's work computer at Andco's offices.  (Rozell Dep. at 109, Exh. V.)

84.    Plaintiff authored the e-mail marked and identified as Exhibit W to her deposition, and sent it to Tasha Seren at Seren's work computer at Andco's offices.  (Rozell Dep. at 109-10, Exh. W.)

85.    Plaintiff authored the e-mail marked and identified as Exhibit X to her deposition, and sent it to Tasha Seren at Seren's work computer at Andco's offices.  (Rozell Dep. at 111-12, Exh. X.)

11

86.     Plaintiff authored the e-mail marked and identified as Exhibit Y to her deposition, and sent it to Tasha Seren at Seren's work computer at Andco's offices.  (Rozell Dep. at 113, Exh. Y.)

87.     Andco instituted AOL accounts for some of its employees in 2001.  (Rozell Dep. at 52, 310-11, Exh. EEE.)

88.     The AOL accounts were intended to serve as a "back up" for Andco's existing e-mail server ("Ross Mail"), which was experiencing problems.  (Rozell Dep. at 52, 310-11, Exh. EEE;  Pirozzi Dep. at 97-98.)

89.     The employee AOL accounts, including Plaintiff's, were paid for directly by Andco, initially through Courtney Ross's personal credit card, and later through corporate cards issued to employees and billed to Mrs. Ross.  (Rozell Dep. at 134-35, 312, Exh. GGG; Pirozzi Dep. at 124; Deposition of Tiffany Ketchum ("Ketchum Dep.") at 21-23.)

90.     Andco's policy in effect during Plaintiff's employment stated that purchases made on company credit cards, such as for the AOL accounts, "are for the purpose of the Family Office business ... and are not to be made for the personal benefit of employees."  (Rozell Dep. at 311, Exh. FFF; Pirozzi Decl., ¶ 6, Exh. 3.)

91.     Plaintiff regularly used the AOL account for business purposes, using it to communicate with Andco employees and to send and receive Andco documents.  (Pirozzi Decl., ¶ 5, Exh. 2;  Pirozzi Dep. at 124; Ketchum Dep. at 21-23.)

92.     When Andco considered discontinuing the AOL accounts in 2004, Plaintiff asked Andco to continue paying for and providing the account, expressly representing that she needed it for business purposes: "For the time being, I would prefer to keep the AOL account because when I am accessing Ross mail from another location as I do every Monday and Friday and

12

when I am traveling, the Ross mail is limited to reading (I cannot open attached documents, copy people, refresh mails, or file them) and I have to respond via AOL." (Rozell Dep. at 52, 310-11, Exh. EEE.)

93.     Based on Plaintiff's representations, Andco agreed to continue providing and paying for the account. (Rozell Dep. at 52, 310-11, Exh. EEE.)

94.     When utilizing the AOL account during her employment, Plaintiff generally used Andco's computer system, as well as company-provided Internet access. (Rozell Dep. at 73-75, 81-82, 267-68; Pirozzi Dep. at 303-05; Seren Dep. at 170; Declaration of Gregory Shaheen ("Shaheen Decl."), ¶ 4-6.)

95.     The laptop computer Plaintiff used during her employment was owned by Andco. (Rozell Dep. at 74-75.)

96.     The desktop computer Plaintiff used at her office was owned by Andco. (Rozell Dep. at 81-82.)

97.     Plaintiff did not own a computer until August 2004. (Rozell Dep. at 96.)

98.     Andco's "Technology and Communication" policy in effect during Plaintiff's employment provided, *inter alia*, that: "The use of computers, software, phones, radios, printers and fax machines are limited solely to Andco related activities." (Rozell Dep. at 47, Exh. H; Pirozzi Decl., ¶ 7, Exh. 4.)

99.     Plaintiff continued to use the AOL account for business through the end of her employment, and never told Andco that she used it for personal matters or considered it her private account. (Pirozzi Decl., ¶¶ 5, 8, Exh. 2.)

100.   After she was discharged, Plaintiff never: (i) asked Andco to discontinue paying for the account; (ii) advised Andco that she would continue to use it; or (iii) notified Andco that she now viewed it as her private account. (Pirozzi Decl., ¶ 9.)

101.   Plaintiff did not begin paying for the AOL account until after the alleged unauthorized access by Andco. (Deposition of Marissa Gahafer ("Gahafer Dep.") at 24.)

102.   On the day of her discharge, Plaintiff used the AOL account to download several Andco reports containing confidential details relating to Courtney Ross's art collection. (Pappas Decl., Exh. 2.)

103.   Subsequent to her discharge, Plaintiff used the AOL account to communicate with Tasha Seren -- via Seren's work computer at Andco's offices -- regarding copying and removing documents from Andco's premises.  Plaintiff told Seren that she was "pondering theft" and instructed her to start copying and removing records. Plaintiff also directed Seren to use a small data storage device as "a means to bring records to your home computer." (Rozell Dep., Exhs. L-Y; Seren Dep., Exhs. TS 17, TS 22-24, TS 26-35.)

104.   Subsequent to her discharge, Plaintiff used the AOL account to instruct Tasha Seren-- via Seren's work computer at Andco's offices -- how to access Andco's security binder, which contained Andco security protocols and alarm system pass codes for entering Mrs. Ross's residence. (Rozell Dep. at 91-92; Seren Dep. at 227, Exhs. TS 26-27.)

105.   Subsequent to her discharge, Plaintiff used the AOL account to instruct Tasha Seren -- via Seren's work computer at Andco's offices -- to make fraudulent statements to Andco about why Seren needed access to Plaintiff's former office and computer. (Seren Dep., Exh. TS 28.)

106.    Subsequent to Plaintiff's discharge, Tasha Seren, at Plaintiff's instruction, copied and removed Andco documents from the premises without authorization, including progress reports and "samples" of her and Plaintiff's work. (Seren Dep. at 181-85, 200, 288, 313, Exhs. TS 55-56.)

107.    During the period she was communicating with Plaintiff via the AOL account, Tasha Seren sabotaged Andco's computer system by deleting the entire contents of the Art Collection Coordinator's computer. (Seren Dep. at 203-06, 251.)

108.    Plaintiff used the AOL account to falsely hold herself out as the Director of the Ross Collection subsequent to her discharge. (Rozell Dep. at 322-23, Exh. HHH; Pappas Decl., Exh. 3.) Plaintiff told third parties that she was "still director" of the collection, and falsely provided her own home address as the new business address of the Ross Collection. (Id.)

109.    AOL's "terms of use" for the account expressly prohibit utilizing its services to commit or solicit illegal or fraudulent acts. (Pappas Decl., Exh. 4.)

110.    Courtney Ross never asked or authorized anyone to access the AOL account, and knew nothing about it until after the fact. (C. Ross Dep. at 304-07.)

111.    Neil Pirozzi and Tiffany Ketchum believed they were acting lawfully when accessing the AOL account. (Pirozzi Dep. at 124; Ketchum Dep. at 21-31.)

112.    Tiffany Ketchum, then known as Tiffany Sharkey, is the person to whom Plaintiff previously made her request for Andco to continue paying for the AOL account based on Plaintiff's representation that she used it for business purposes. (Rozell Dep. at 310, Exh. EEE; Ketchum Dep. at 6.)

15

113.   Neil Pirozzi gave Tiffany Ketchum a general instruction to access the AOL account, but did not give her directions on how to do so, nor was he aware of the specific steps she took to gain access. (Pirozzi Dep. at 105; Ketchum Dep. at 29.)

114.   Tiffany Ketchum was not a managerial employee of Andco at the time she accessed the AOL account. (Ketchum Dep. at 13-14.)

115.   Andco believed that Plaintiff and Tasha Seren had conspired to steal company documents and sabotage the computer system. (Pirozzi Dep. at 107-08, 138-42; Deposition of Stephen Szczepanek ("Szczepanek Dep.") at 224-42, Exh. 14; L. Ross Dep. at 178-85, 190-96, 198-201; Narizzano Dep. at 309-11, 313, 319-23.)

116.   Neil Pirozzi attempted to avoid reading e-mails from the AOL account that seemed purely personal in nature, and tried to review only those that appeared business-related or concerned the unlawful activities of Plaintiff and Tasha Seren. (Pirozzi Dep. at 110.)

117.   Subsequent to her discharge, Plaintiff devoted substantial time to writing fiction and non-fiction books that she never intends to publish. (Rozell Dep. at 296-98; Arnold Dep. at 29, 71-72.)

118.   Subsequent to her discharge, Plaintiff has written hundreds, if not thousands, of pages -- enough material for several full-length books. (Rozell Dep. at 296-98; Arnold Dep. at 29, 71-72.)

119.   Plaintiff turned down at least one offer of paying employment in order to concentrate on writing. (Pappas Decl., Exh. 5.)

120.   In May 2004, Plaintiff told a friend that she had rejected a job offer, stating, "I am feeling that I should not take on little stuff and just concentrate on accomplishing some writing, especially if I can get unemployment. When else will I have the time?" (Pappas Decl., Exh. 5.)

121.   In May 2004, Plaintiff stated, "I am just so happy not to be working…. Found a good little café for writing yesterday.  You know, doing the Parisian thing…." (Pappas Decl., Exh. 5.)

122.   Subsequent to her discharge, Plaintiff spent considerable time traveling to Europe and other destinations, including Berlin (where she owns an apartment), Munich, Prague, Milan, Miami, and Cape Cod.  Plaintiff took at least a dozen such trips between May 2004 and December 2005.  (Pappas Decl., Exh. 6.)

123.   Plaintiff told her therapist that her husband stated "You can't just keep taking off. You need an income." (Arnold Dep. at 63.)

124.   Plaintiff told her therapist that her husband could not understand "what was holding [her] back," since "[t]here are people with [her] degrees and fluencies who are very successful." (Arnold Dep. at 65.)

125.   Plaintiff has applied for only a handful of paying jobs in her field in the 2+ years since she was discharged, averaging only about 1 application every 3 months.  (Pappas Decl., Exh. 7.) The earliest documented job application by Plaintiff is dated September 20, 2004 -- five months after her discharge.  (Id.)

126.   Neil Pirozzi had no ownership interest in Andco and no authority to make hiring and firing decisions concerning Plaintiff.  (C. Ross Dep. at 88-89; Pirozzi Dep. at 39-40; Seren Dep. at 130, 134-35, Exh. TS-11; Pirozzi Decl., ¶ 3.)

127.   Plaintiff filed her EEOC charge in July 2004.  (Complaint, ¶ 9.)

Dated: August 31, 2006                    LITTLER MENDELSON, P.C.

                                          Attorneys for Defendants


                                By:       _____
                                          A. Michael Weber (AW-8760)
                                          Michael P. Pappas (MP-6716)
                                          Elena Paraskevas-Thadani (EP-7758)
                                          885 Third Avenue
                                          New York, New York 10022
                                          (212) 583-9600