**EXHIBIT 9    (PART  I)**

**COPY**

1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - -X

MARY ROZELL,

                     Plaintiff,

              -against-            Index No.
                                    05CV 2936

COURTNEY ROSS-HOLST, an individual,

Andco, LLC, a corporation, and NEIL

PIROZZI, an individual,

                    Defendants.

- - - - - - - - - - - - - - - - - - - - - -X

                  February 1, 2006

                  10:10 a.m.

DEPOSITION of MARY ROZELL, the Plaintiff herein,

taken pursuant to Notice, and held at the offices

of Littler Mendelson, P.C, 885 Third Avenue, New

York, New York, before Debra A. Levinson,

CSR-RMR-CRR, a Court Reporter and Notary Public

of the State of New York.



DALCO REPORTING, INC.
170 Hamilton Avenue, White Plains, New York 1060
49 W. 37th Street, New York, New York 10018
914.684.9009  Fax 914.684.6561  800.DAL.8779
212.679.6095  www.dalcoreporting.com

**MARY ROZELL**

12

1          A.     Prior to that I lived for three

2    weeks on the upper east side.  I lived -- well, I

3    was just staying in different places between

4    homes.  I lived on 38 West 9th Street.

5          Q.     How long did you live at 38 West

6    9th?

7          A.     From September or -- no, I think it

8    was August, 2004, to May of 2005.

9          Q.     And prior to August '04 where did

10   you live?

11         A.     50 west 9th Street.

12         Q.     For how long?

13         A.     I moved there on -- in April of

14   2000; I think.  Yes.  2000.

15         Q.     And with whom did you live when you

16   lived at 50 West 9th?

17         A.     My husband.

18         Q.     And when you were at 38 West 9th?

19         A.     My husband, and my son.

20         Q.     And upper east side the same?

21         A.     Yeah.

22         Q.     Husband and same, husband and son

23   now?

24         A.     Uh-hum.



MARY ROZELL

17

1       A.      Yes.

2       Q.      Is your husband employed currently?

3       A.      Yes.

4       Q.      Where?

5       A.      At Random House.

6       Q.      And how long has he been employed

7    there?

8       A.      Seven or eight years, I believe.

9       Q.      And what position does he hold

10   there?

11      A.      He's an attorney.

12      Q.      And what kind of attorney?

13      A.      He's -- he represents the children's

14   division, children's, publishing.

15      Q.      Publishing?

16      A.      Uh-hum.

17      Q.      His specialty is publishing?

18      A.      Uh-hum.

19      Q.      What's his salary?

20      A.      I think it's about a hundred eighty

21   thousand, and then there's a bonus, I'm not quite

22   sure.

23      Q.      Do you belong to any clubs or

24   organizations?



MARY ROZELL

18

1          A.    I belong to the DC bar and the

2     California bar.

3          Q.    Any other?

4          A.    My gym.

5          Q.    Any other?

6          A.    I don't think so at the moment.

7     Museums, I have a lot of museum memberships.

8          Q.    Where did you go to high school?

9          A.    Hudson Falls High School, Hudson

10    Falls, New York.

11         Q.    And college?

12         A.    Hamilton College, Clinton, New York.

13         Q.    Any major there?

14         A.    French.

15         Q.    Anything else?

16         A.    I had a minor in art history.

17         Q.    And when did you graduate?

18         A.    '84.

19         Q.    Any post-graduate work?

20         A.    Yes.  I went to Pepperdine School of

21    Law in Malibu, California.  I graduated in 1989.

22    And I have a master's degree in art history from

23    the Courtauld Institute of Art in London.

24         Q.    Tell me something about that



MARY ROZELL

19

1    institution.

2         A.    It's considered one, if not the best

3    art school, art history school in Europe.  And it

4    offered German expressionism, which is my

5    specialty, and it's a very good school.

6         Q.    And when did you go there?

7         A.    I graduated in '94 with my masters.

8         Q.    Is that a, how many years did you go

9    there?

10        A.    It was a year and a half.  It was my

11   program.

12        Q.    Prior to -- strike that.

13             Did you go to any other schools or

14   take any other advanced courses after the

15   institution you just mentioned?

16        A.    Well, I took language classes, lots

17   of them.  Do you want to know?

18        Q.    What language?

19        A.    I took German.  I took -- I took

20   German at the Goethe Institute in Berlin and I

21   took it at the Department of Agriculture in

22   Washington, D.C, and then I took Spanish and

23   Japanese.  Oh, and I've taken, when I got back

24   here I took Italian at the New School.



**MARY ROZELL**

25

1        Q.    Were they ill at the time?

2        A.    Yes.

3        Q.    And prior to working for Ziff

4    Brothers where did you work?

5        A.    I was self-employed in Germany.

6        Q.    Doing what?

7        A.    I was working as a curator at a

8    gallery in Weimar, W-E-I-M-A-R.

9        Q.    Which gallery?

10       A.    It's called the ACC Gallery.

11       Q.    And how long were you there?

12       A.    I started officially in '95 or '96.

13   I think my first expedition was '96.

14       Q.    And what did you do there?

15       A.    I was a curator and I was the

16   director of the studio program for international

17   artists.

18       Q.    Full-time job?

19       A.    Yeah.

20       Q.    What was your salary?

21       A.    I was paid monthly something like

22   2500 D-Marks.

23       Q.    What's the conversion?  Or what was

24   it then?



MARY ROZELL

26

1          A.     What was the conversion, I don't

2 know. $1200 or something a month.

3          Q.     So about 15,000 a year American

4 dollars?

5          A.     No, I think I was making 20

6 something a year.

7          Q.     20 something?

8          A.     Uh-hum.

9          Q.     And how long were you at the

10 gallery?

11          A.     Until -- until some point towards

12 the end of '99 when I left.

13          Q.     And why did you leave?

14          A.     I was coming back to the United

15 States.

16          Q.     And why were you coming back?

17          A.     Because my mother was ill.

18          Q.     Prior to working at ACC Gallery

19 where did you work?

20          A.     Also, I should add that I -- at the

21 same time I worked at ACC I was the German

22 correspondent -- the correspondent in Germany for

23 The Art Newspaper which is based in London.

24          Q.     How long did you do that?

dalco
court reporting & legal video

**MARY ROZELL**

27

1           A.     I started that in '95.

2           Q.     Was that a paying job?

3           A.     Yes.

4           Q.     How much did you get paid?

5           A.     I was paid something like a hundred

6      pounds for, a hundred and 20 words or something.

7      I was paid by the word.

8           Q.     Over, over the period, over a year

9      how much did you earn from that newspaper?

10          A.     Not much.  I don't know.  A couple

11     thousand dollars or something.

12          Q.     A year?

13          A.     Yeah.

14          Q.     And prior to that where were you

15     employed?

16          A.     When I first got to Germany I had

17     small jobs, part-time jobs.  I got there in the

18     fall of '94 and I immediately start working at a

19     technical university in a town called Swickau,

20     S-W-I-C-K-A-U.

21          Q.     What did you do there?

22          A.     I was an adjunct professor.

23          Q.     For how long?

24          A.     About a year.  I think it was about

MARY ROZELL

28

1    a year.

2            Q.    And what did you earn?

3            A.    I don't remember.

4            Q.    Prior to that where were you

5    employed?

6            A.    I was in graduate school prior to

7    that.  I also, during that period, I worked again

8    on a contract basis for Villa Grisebach Auctions,

9    for about a year.

10           Q.    Were you paid?

11           A.    Yes.

12           Q.    How much?

13           A.    I think I was paid 5,000 D-Marks a

14   month there.

15           Q.    How long did you do that?

16           A.    That was about a year.

17           Q.    Why did you leave?

18           A.    Because I started in Weimar.

19           Q.    And where did you work before that?

20           A.    Before that I was in London, I was

21   in school.  And before that I worked at Loe and

22   Mahon, and then it was just Paul Mahon at the law

23   firm.

24           Q.    And, it's a law firm?

MARY ROZELL

1          A.    Uh-hum.

2          Q.    Located where?

3          A.    Washington, D.C.

4          Q.    And how long were you there?

5          A.    I was there from -- it was either

6     the end of '89 or the beginning of 1990 until I

7     left.

8                MS. PERATIS:  Can we just take a

9          break for a second.

10               MR. WEBER:  We may.

11

12               (Recess taken.)

13

14               (The requested testimony was

15               read back.)

16

17    BY MR. WEBER:

18         Q.    And when was that?

19         A.    I left some time in '93.

20         Q.    Why did you leave?

21         A.    Because I was going to graduate

22    school again.

23         Q.    And what was your position at Loe

24    and Mahon or whatever it was?

MARY ROZELL

1         A.    I was an associate attorney.

2         Q.    In what area of specialty?

3         A.    Art law.

4         Q.    And prior to that where did you

5    work?

6         A.    Prior to that I was in law school.

7    I had several jobs while I was in law school.  I

8    don't know.

9

10                    (Defendants' Exhibit A,

11                    RESUME, was marked for

12                    identification.)

13

14        Q.    I show you what's been marked as

15   Defendants' Exhibit A for identification.  Can

16   you identify the document?

17        A.    It's a resume.

18        Q.    Whose?

19        A.    Mine.

20        Q.    Who prepared it?

21        A.    Me.

22        Q.    Did you prepare it?

23        A.    I guess.

24        Q.    Well, I don't want you to guess.

MARY ROZELL

31

1    Take a look at it.

2         A.    Yes.

3         Q.    Yes, you prepared it?

4         A.    Yes, I believe so, yes.

5         Q.    Is that a true and accurate resume?

6         A.    I believe so.

7         Q.    Let me rephrase that.  Is everything

8    that you put down here true and accurate?

9         A.    I believe so.

10        Q.    Okay.  You mentioned --

11             MS. PERATIS:  Before you ask a

12        question.

13

14             (Discussion held off the record.)

15

16             MR. WEBER:  Well -- I'm going to

17        object if you're going to direct the

18        witness one way or another.

19             MS. PERATIS:  No, I'm not directing

20        the witness at all.

21             MR. WEBER:  It's inappropriate for

22        you to have discussions with her during a

23        deposition.

24             MS. PERATIS:  Well, when a

MARY ROZELL

32

1           question's not pending, I think it's not

2           inappropriate but, at any rate, go ahead.

3       Q.    You mentioned before that someone

4   approached you about a position at Andco when you

5   were at the Swiss Institute?

6       A.    Yes.

7       Q.    Who was that?

8       A.    Lori Schiaffino.

9       Q.    And who is she?

10      A.    She was Mrs. Ross-Holst right hand

11  person at the time, I believe.

12      Q.    And did that position seem appealing

13  to you?

14      A.    Yes.

15      Q.    And why was that?

16      A.    Because it was -- it was working

17  with art works, directly with art works.  It

18  seemed international in scope.  I was interested

19  in the Ross schools since I had a background in

20  education and teaching and I value that, and

21  yeah, I thought it sounded very interesting.

22

23           (Defendants' Exhibit B, SWISS

24           INSTITUTE THREE-PAGE DOCUMENT,



47

1        Q.    Okay.  Fair enough.

2              Did there come a time when you did

3   receive a job description for your position at

4   Andco?

5        A.    Other than this?

6        Q.    Other than what we've -- what's

7   before you right now.

8        A.    No, I don't believe so.

9

10             (Defendants' Exhibit H, ANDCO

11             HANDBOOK, was marked for

12             identification.)

13

14       Q.    I show you what's been marked

15  Defendants' Exhibit H for identification.  Can

16  you identify that document?

17       A.    This was one of the handbooks that

18  was drafted while I was there, I believe.

19       Q.    Did you ever receive that when you

20  started employment?

21       A.    I received a handbook.  I'm not sure

22  if it was this exact one because it changed a

23  couple of times.

24       Q.    In looking at this, does this appear

MARY ROZELL

48

1      to be the one that you received or you don't

2      recall?

3             A.    I'm not exactly sure.

4

5                      (Defendants' Exhibit I,

6                      NONDISCLOSURE AGREEMENT, was

7                      marked for identification.)

8

9             Q.    I show you what's been marked as

10     Defendants' Exhibit I, the document entitled

11     Nondisclosure Agreement.

12                  Can you identify this document?

13            A.    It looks like the nondisclosure

14     agreement that I signed.

15            Q.    And you signed it on or about July

16     25th, 2001?

17            A.    Uh-hum.

18            Q.    And who signed it on behalf of

19     Andco?

20            A.    Darius Narizzano.

21            Q.    And what was his position at Andco?

22            A.    He was the butler.

23            Q.    Did he have any other position?

24            A.    He had different titles.  I think

**MARY ROZELL**

1    words, I want what you understood your

2    obligations were.

3                    MS. PERATIS:  I think she's answered

4              that question.  Objection; asked and

5              answered.

6         Q.    Is there anything else that you

7    understood your obligations to be other than what

8    you just said with respect to your obligations

9    under this agreement?

10        A.    I don't think so.

11        Q.    Okay.  Do you recall when you

12   started working at Andco; the date?

13        A.    I think it was September 4th, 2001.

14        Q.    I'm sorry?

15        A.    September 4th, I think, or 5th,

16   2001.

17        Q.    This is signed July 25th, 2001;

18   correct?

19        A.    Uh-hum, yes, it looks like it.

20   Uh-hum.

21        Q.    When do you recall receiving a job

22   offer?

23        A.    I don't recall.  I don't recall the

24   exact date.



MARY ROZELL

1          Q.     Approximately?

2          A.     Sometime in July I would think.

3          Q.     And whose decision was it for you to

4    start in September, yours or --

5          A.     I think it was mine.

6          Q.     You wanted to take the summer off?

7          A.     No.

8          Q.     Family obligations?

9          A.     Yeah, I had obligations.

10         Q.     Okay.  Were you told who you were

11   going to report to when you were starting?

12         A.     Yes.  I was told I was to report to

13   Courtney and the, the family office president.

14         Q.     And who was that?

15         A.     Her name is Catherine Stanke.

16         Q.     Anybody else?

17         A.     No.

18         Q.     And did you interview with Miss

19   Stanke?

20         A.     No.

21         Q.     Did you meet her before you started?

22         A.     I think I came in for a meeting

23   before I started.

24         Q.     And met with her?

MARY ROZELL

54

1       A.      Met with a group of people.

2       Q.      Who else?

3       A.      I think the whole staff in 71st

4    Street was there.  I don't recall exactly.

5

6                       (Defendants' Exhibit J, MEMO

7                       FROM LORI SCHIAFFINO TO MARY

8                       ROZELL, was marked for

9                       identification.)

10

11      Q.      I show you what's been marked

12   Defendants' Exhibit J for identification, a memo

13   from Lori to you dated July 19th, 2001.

14                   Can you identify that document?

15      A.      It's an offer from Lori to me.

16      Q.      Offer of what?

17      A.      For employment.

18      Q.      Did you respond?

19      A.      Pardon?

20      Q.      Did you respond to this?

21      A.      I believe so.

22      Q.      Does this set forth terms and

23   conditions of employment?

24                   MS. PERATIS:  Objection.

**MARY ROZELL**

55

1          Q.    You may answer.

2          A.    Some.

3          Q.    Not all?

4          A.    No, not all.

5          Q.    What terms and conditions are

6    missing?

7                MS. PERATIS:  Objection.

8          Q.    You may answer.  And I don't mean

9    every single specific job duty.  I mean,

10    generally, what's missing --

11          A.    Well --

12          Q.    -- if anything.

13          A.    -- there's what would be in a basic

14    employment contract is missing.  I'd asked for a

15    contract.

16          Q.    Did you get one?

17          A.    This was the closest thing I got to

18    a contract.

19          Q.    Did you propose specific terms and

20    conditions in an employment contract?

21          A.    There was a discussion about it.

22          Q.    What did you request?

23          A.    I don't recall.

24          Q.    Did you --

MARY ROZELL

1        A.      Just in terms of vacation and health

2     insurance, those sorts of things.

3        Q.      Do you remember anything else that

4     you requested that would be included in an

5     employment agreement?

6        A.      No, I don't remember.

7        Q.      Do you recall what you requested by

8     way of vacation?

9        A.      I think I might have requested four

10    weeks.

11       Q.      Do you remember what you requested

12    by way of health insurance?

13       A.      I don't recall.

14       Q.      Do you remember seeing anything else

15    that you requested?

16       A.      There were general things that I

17    requested.  I wanted to be assured that I could

18    attend a conference that I went to, and I wanted

19    to know the scope of travel, how much travel was

20    expected of me, that sort of thing.

21       Q.      And did your employer address those

22    issues?

23       A.      Well, my employer being Lori, as a

24    representative of my employer?

**MARY ROZELL**

1       Q.    Your employer being Andco.

2       A.    Not all.

3       Q.    Is this memo from Lori to you the

4    response to your request?

5       A.    I don't think so.

6       Q.    Do you know what this me was?

7       A.    This memo here?

8       Q.    Yes.  Defendants' Exhibit J for

9    identification.

10       A.    Do I know what it was?

11       Q.    In other words, do you know why it

12    was written to you?

13           MS. PERATIS:  You mean does she know

14       why Lori wrote it to her?

15           MR. WEBER:  Correct.

16       A.    Lori --

17           MS. PERATIS:  Objection.  You can

18       answer.

19       A.    She appears to be offering me the

20    job.

21       Q.    And what did you do, if anything, in

22    response?

23       A.    I think I wrote something back

24    accepting the position.

MARY ROZELL

58

1
2                         (Defendants' Exhibit K, LETTER
3                         FROM MARY ROZELL TO LORI, was
4                         marked for identification.)
5
6          Q.    I show you Defendants' Exhibit K for
7    identification, a letter from you to Lori; can
8    you identify that document?
9          A.    It looks like my response to her
10   memo.
11         Q.    The one we just identified before as
12   Exhibit --
13         A.    J.
14         Q.    -- J?
15         A.    Uh-huh.
16         Q.    Did you ever report to a Marisa
17   O'Neil?
18         A.    I reported to her but I was never
19   sure if it was official.
20         Q.    How long did you report to her?
21         A.    Again I'm not sure.  I mean she told
22   me one day that I was reporting to her but I
23   didn't know if that was really the case.
24         Q.    You understood that you were

MARY ROZELL

1    reporting to Ms. Ross-Holst?

2         A.    Yes.

3         Q.    Anybody else you report to?

4         A.    When Catherine Stanke left I was

5    never told by Mrs. Ross-Holst that I was

6    reporting to anyone else.

7         Q.    Did you ever travel with Ms. Ross?

8         A.    Yes, I did.

9         Q.    Where did you travel to?

10        A.    We went to Sweden.

11        Q.    On how many occasions?

12        A.    We went to Sweden just once.

13        Q.    Did you travel anywhere else with

14   her?

15        A.    No, I don't believe so.  We met in

16   East Hampton but Sweden was our only trip

17   together, other than trips within Manhattan.

18        Q.    In negotiating the terms and

19   conditions of your employment did you ask for a

20   particular salary?

21        A.    I think I asked for 90,000.

22        Q.    And the offer was 80?

23        A.    I don't think so.

24        Q.    What was your salary when you

**MARY ROZELL**

61

1          Q.    Did you have any understanding of

2     what role you would play with respect to the

3     household staff?

4                     MS. PERATIS:   Objection.

5          A.    I was told at times that I would be

6     in a supervisory position.   When I started

7     working there I wasn't in the building so that

8     wasn't very practical.

9          Q.    What were you told by -- your

10    responsibilities with respect to the part-time

11    employees?

12                    MS. PERATIS:   Objection.

13         Q.    You can answer.

14         A.    Well, one of them is Judy Beardsall.

15     I was told she was reporting to me.

16         Q.    And who is she?

17         A.    She's the wine curator consultant.

18         Q.    Anyone else?

19         A.    I don't think so.

20         Q.    And what were you told about your

21    obligations or job duties with respect to the art

22    department?

23         A.    That the staff would report to me.

24         Q.    And do you know, were you told what

MARY ROZELL

1     the staff consisted of?

2          A.    At the time I was hired there were

3     two other people, besides myself, and I was told

4     to make recommendations by October of 2001.

5          Q.    Who were the two individuals that

6     you just mentioned?

7          A.    Bettina Sulser and Jo Wheeler.

8          Q.    And when you were told to make

9     recommendations by October 1?

10         A.    Uh-hum.

11         Q.    2001, recommendations regarding

12    additional staff?

13         A.    Uh-hum.

14         Q.    And did you make those

15    recommendations?

16         A.    I did.

17         Q.    And did you recommend hiring of

18    additional staff?

19         A.    I did.

20         Q.    And what positions did you recommend

21    should be filled or hired?

22         A.    I recommended hiring -- I don't

23    remember how I termed it at the time; I think I

24    was calling it a curatorial assistant.  I was

**MARY ROZELL**

63

1    looking for someone to do cataloging of the

2    collection.

3         Q.    Anybody else, any other

4    recommendations?

5         A.    No.

6         Q.    And to whom did you make those

7    recommendations?

8         A.    I wrote a memo to Mrs. Ross-Holst.

9         Q.    And did you outline the job

10   descriptions of the individuals?

11        A.    Yes.

12        Q.    And were those recommendations

13   accepted?

14        A.    I never heard.

15        Q.    Did there come a time when you hired

16   individuals into those positions?

17              MS. PERATIS:  Objection.

18        A.    There was a time when I hired an

19   archivist.

20        Q.    And who was that?

21        A.    Tasha Seren.

22        Q.    And how did you learn of Tasha

23   Seren?

24        A.    A fax came into the office at 71st

MARY ROZELL

64

1  Street and the fax was forwarded to me.

2          Q.     Do you know how it came to 71st

3  Street?

4          A.     No.

5          Q.     Did you hire anybody else in the

6  department?

7          A.     I hired someone named Sanjay Tockor

8  (ph), and I hired Leah Ross.

9          Q.     And what positions were they hired

10  in?

11          A.     Collections coordinator was Leah's

12  position, and Sanjay had the same position.  I'm

13  not sure what title he had.

14          Q.     And did you describe, did you draft

15  those job descriptions?

16          A.     I did.

17          Q.     And you hired those individuals?

18          A.     I did.

19          Q.     Did you set their salaries?

20          A.     I did.

21          Q.     And their hours?

22          A.     Yes, more or less.

23          Q.     Do you know what Andco's general

24  policy was with respect to vacation for its

MARY ROZELL

65

1   employees?

2                   MS. PERATIS:  Objection.

3        A.    I don't remember a policy.

4        Q.    Can you describe where you were

5   physically working when you started in September

6   of 2001 for Andco?

7        A.    I was working in what they called

8   the accounting offices.

9        Q.    And where were they?

10       A.    The street address -- I don't recall

11   the street address.  It was in the 50s.

12       Q.    East 50s?

13       A.    Uh-hum.

14       Q.    In New York City?

15       A.    Uh-hum.

16       Q.    And who was in the accounting office

17   when you started?

18       A.    Catherine Stanke, Bob McGary (ph.),

19   Peggy O'Mahoney.

20       Q.    And do you know what positions they

21   held?

22       A.    Catherine Stanke was the family

23   office president.  And Peggy and Bob did

24   bookkeeping.  I don't know what their titles

MARY ROZELL

66

1      were.

2              Q.    And how long were you located in

3      that office?

4              A.    I think it was close to a year.

5              Q.    2001 to 2002?

6              A.    I was asked to leave that location

7      sometime in the summer of 2002.

8              Q.    And why were you asked to leave?

9              A.    Marisa O'Neil told me that Courtney

10     wanted me in her apartment.

11             Q.    During the period of time when you

12     were working in the east 50s accounting office,

13     what were you doing?

14             A.    I was doing my job.

15             Q.    What was that job?

16             A.    I was director of the art collection

17     and cultural affairs.

18             Q.    And what did that consist of?

19             A.    That consisted of managing the art

20     collection and the art staff.

21             Q.    Were you given any specific

22     directions when you started with respect to the

23     art collection?

24             A.    No, not really.

MARY ROZELL

1       Q.     Uh-hum.

2       A.     My computer.

3       Q.     Anything else?

4              MS. PERATIS:  You want to give her a

5       time frame?  Are you talking about during

6       employment or after?

7              MR. WEBER:  Both.

8       A.     I removed -- I was working on bed

9  rest for a number of months.  I had documents

10  brought to me every week so I could work.

11      Q.     What kind of documents?

12      A.     All sorts of documents that we were

13  working on.

14      Q.     Did you share them with anybody

15  other than yourself?

16      A.     No.

17      Q.     Did you remove any other documents

18  or information from the premises?

19      A.     I would bring magazines home

20  sometimes.

21      Q.     Did you return them?

22      A.     Yes.

23      Q.     Anything else?

24      A.     My computer, like I said.

MARY ROZELL

74

1        Q.    Anything else?

2        A.    Can't think of anything else.

3        Q.    Was that a laptop?

4        A.    Yes.

5        Q.    Did you buy that?

6        A.    No.

7        Q.    A company laptop?

8        A.    Uh-hum.

9        Q.    Was that ever stolen?

10       A.    Another one was stolen.

11       Q.    What other one?

12       A.    The first one that I had.

13       Q.    When was that?

14       A.    It was stolen June of -- let me

15    think.  I think, 2002.

16       Q.    Do you know where it was stolen

17    from?

18       A.    It was stolen in the airport.

19       Q.    You were traveling?

20       A.    Yes.

21       Q.    From where to where?

22       A.    From Mrs. Holst's residence in

23    Stockholm back to New York.

24       Q.    Was it ever recovered?

MARY ROZELL

1       A.    No.

2       Q.    Did the company replace that laptop?

3       A.    Yes.

4       Q.    Anything else that you ever removed

5  from the premises?

6           MS. PERATIS:  Objection.  Asked and

7       answered.

8       Q.    You may answer.

9       A.    I don't recall specifically.  There

10  may have been things like fabric samples.  A lot

11  of times I had to go out in the field and find

12  things.

13       Q.    Do you know if other employees were

14  obligated to sign nondisclosure agreements?

15       A.    I think that was standard practice.

16       Q.    Did there ever come a time when you

17  asked anyone to obtain Andco property for you

18  after your termination?

19       A.    Yes.

20       Q.    Who did you ask?

21       A.    Tasha Seren.

22       Q.    And when did you ask her?

23       A.    Right after I was fired.

24       Q.    And what was the purpose of your

**MARY ROZELL**

80

1    on the computer.

2            Q.    On the Andco computer?

3            A.    Yes.

4            Q.    What personal documents?

5            A.    All personal correspondence,

6    resumes, whole bunch of pictures, my father, my

7    son, my address book, there were other personal

8    documents.

9            Q.    Can you remember what they were?

10            A.    Just, yeah, I don't remember all of

11    them, no.

12            Q.    And did Tasha get those things for

13    you?

14            A.    No.

15            Q.    She never sent you anything?

16            A.    No.

17            Q.    Did you -- strike that.

18                  Do you know if Tasha signed a

19    nondisclosure agreement?

20            A.    I believe she did.

21            Q.    Did you ever tell anybody you were

22    planning to write a book about your experiences

23    at Andco and working with Ms. Ross-Holst?

24            A.    No.



MARY ROZELL

1         Q.    Did you ever prepare any notes

2    concerning writing a book?

3         A.    No.

4         Q.    Did you ever start any outlines

5    concerning a book about Ms. Ross-Holst?

6         A.    No.

7         Q.    Or Andco?

8              Did you ever talk to an agent about

9    writing a book?

10        A.    No.

11

12              (Defendants' Exhibit L,

13              E-MAIL, was marked for

14              identification.)

15

16        Q.    I show you a document, Defendants'

17   Exhibit L for identification.  Can you identify

18   that document?

19        A.    It's an e-mail from me to Tasha.

20        Q.    What were you asking for or what

21   were you stating?

22        A.    I'd asked her to ask Shawn, Shawn

23   Mishler, was her tech guy -- when I was leaving,

24   when I was dismissed, I wasn't allowed to touch

MARY ROZELL

82

1      my computer, and I asked Darius Narizzano for my

2      personal things off that computer and he said he

3      would give them to me and asked me to watch him,

4      and he supposedly put all my personal documents

5      on to a CD ROM and then he put them in the trash

6      and handed me the CD ROM and when I got home

7      there was nothing on that CD ROM.

8              Q.    What did he put in the trash?

9              A.    All of my documents, all of my

10     personal documents.

11             Q.    From the computer?

12             A.    From the computer.  So I asked Tasha

13     if she could ask Shawn if he could get those

14     things out of the trash, if there's any way to

15     retrieve them.

16             Q.    When you say "put them in the trash"

17     you mean the hard copy?

18             A.    I don't know what you mean.

19             Q.    When you mean -- in the trash bucket

20     on the computer or the physical?

21             A.    The trash bucket on the computer.

22             Q.    Got it.  Okay.  And that's what you

23     were asking for?

24             A.    Yes.



MARY ROZELL

1      for a private collector.

2            Q.    The phrase, it would not be a -- "it

3      would not be good to have the boss's girlfriend

4      checking up," what does that refer to?

5            A.    Bettina at the time was the

6      girlfriend of Larry Gagosian and I just felt that

7      Tash -- I was advising Tasha to just --

8            Q.    The girlfriend of whom?

9            A.    Larry Gagosian -- to negotiate on

10     her own and not through Bettina.

11

12                       (Defendants' Exhibit N,

13                       E-MAIL, was marked for

14                       identification.)

15

16           Q.    I'm showing you Defendants' Exhibit

17     N.

18                 Can you identify it?

19           A.    This is an e-mail from me to Tasha.

20           Q.    Tell me what the -- what you said

21     there.

22           A.    This is when Tasha wasn't allowed to

23     go upstairs.  Normally, if I wasn't there, the

24     protocol was that Tasha would lock up and Tasha

MARY ROZELL

1    was not allowed to do that.

2         Q.    Can you describe the physical

3    facilities where you were working shortly before

4    you were terminated?

5         A.    My office?

6         Q.    Correct.  Where were you working on

7    71st Street?

8         A.    I was working at 71st Street on the

9    12th floor.

10        Q.    And what's on the 12th floor?

11        A.    It's the first floor of Ms.

12   Ross-Holst's duplex.  I was in an office that

13   they refer to as the black and white office.  It

14   opened on to the breakfast room, and that was

15   attached to one of the kitchens.

16        Q.    Who else worked on that floor?

17        A.    The housekeeping staff was there.

18   When Mrs. Ross-Holst was in residence, her

19   assistant would be there, Darius Narizzano would

20   be there, sometimes Neil Pirozzi would be there.

21   All sorts of assistants and people would be

22   there, people she had meetings with when she was

23   there -- and her chef.

24        Q.    Was that the Andco offices on the

dalco
court reporting & legal video

**MARY ROZELL**

1       12th floor?

2              A.      There were Andco offices on the

3       first floor and on the 12th floor.

4              Q.      What was on the first floor?

5              A.      On the first floor was where the art

6       staff and other staff, the interiors person, the

7       receptionist, her personal shopper.  That's where

8       they were.

9              Q.      Who was on the 13th floor if

10      anybody?

11             A.      On the 13th floor?

12             Q.      Was that her personal residence?

13             A.      The 13th floor was also her personal

14      -- the 12th and 13th were her personal residence.

15             Q.      Where was her bedroom?

16             A.      Her bedroom was on the 13th floor.

17             Q.      What else was on the 13th floor?

18             A.      Her other bedrooms and guest

19      bedrooms, an exercise room with a sauna, massage,

20      a private hair salon, something called the

21      Chinese room, just a room she liked.

22                     MR. WEBER:  Off the record.

23

24                     (An off-the-record discussion

