EXHIBIT 9  (PART II)

MARY ROZELL

88

1                              was held.)

2

3              A.    Her husband Ander's office was up

4       there as well.  Her dressing suite, her closets.

5       I think that's about it.

6              Q.    Was business conducted on the 12th

7       floor?

8              A.    Primarily.

9              Q.    What business was conducted on the

10      13th floor?

11             A.    She had meetings in the Chinese room

12      a lot.

13             Q.    What -- was that a, I'll use the

14      word "den" for a better word; how would you

15      describe it?

16             A.    I wouldn't call it a den.

17             Q.    What would you call it, just a

18      private room for meetings?

19             A.    Closer to a palace.  It was a

20      beautiful private room.

21             Q.    What was in it?

22             A.    A double desk, a bed, a sofa, lots

23      of art work, leather floor.

24                          MS. PERATIS:  Leather floor? I've

**MARY ROZELL**

89

1          never heard of a leather floor.

2                Q.     What else?

3                A.     When you had to replace a tile you

4      learn a lot about it.  Anyway, yeah, art works, a

5      bathroom.

6                Q.     And occasionally there would be

7      meetings held in the Chinese room?

8                A.     Yes.

9                Q.     Exception to the rule?

10                MS. PERATIS:  What?

11                Q.     Meaning it was rare that there would

12     be meetings there or they were regular?

13                A.     It wasn't rare.  It wasn't rare.  It

14     would depend on her mood.

15                Q.     What else was on the 12th floor

16     beside what you've described?

17                A.     On the 12th floor was my office, the

18     breakfast room, two kitchens, formal dining room,

19     formal living room, her library, her study, staff

20     offices, screening room, and -- oh, a game room,

21     and several large foyers.

22                Q.     And who else worked there besides

23     you on the 12th floor?

24                MS. PERATIS:  Asked -- objection;

MARY ROZELL

1          A.     I was asking about why Leah was

2     locking up.

3          Q.     Why were you asking about why Leah

4     was locking up?

5          A.     Because she never was the one

6     locking up.

7          Q.     At this point did you understand

8     that she could not, "she" meaning Tasha, could

9     not access your personal information that you

10    were requesting?

11         A.     I'm not sure if I fully understood

12    it yet.

13         Q.     When you say, "No, it's in my

14    security binder, are they really having her lock

15    up?" what does that mean?

16         What did you mean by, "No, it's in my

17    security binder"?

18         A.     I don't recall.

19         Q.     What was your security binder?

20         A.     My security binder had security

21    protocols for the alarm systems, it had some

22    codes.  I was responsible for giving people codes

23    and passwords.

24         Q.     For what purpose?

MARY ROZELL

92

1          A.    For the security system in the
2    apartment; which meant the general security in
3    terms of just the lock system but also the art
4    works because many of those were alarmed.
5          Q.    Mrs. Ross-Holst was concerned about
6    security?
7          A.    Yes.
8          Q.    When someone entered the building on
9    71st Street was there a requirement to sign in?
10               MS. PERATIS:  Objection; when?
11         Q.    Any time.
12         A.    When I first started working there
13   there was no system at all, and at some point I
14   tried to set up a system.  We did set up a system
15   where people had to sign in on the first floor
16   with Carrie Chmiel before going upstairs.
17         Q.    How long did that continue?
18         A.    It went on for many months.  I'm not
19   sure when and if it ended.
20         Q.    When did it start?
21               MS. PERATIS:  You mean when did the
22               sign-in system testimony start?
23               MR. WEBER:  Correct.
24               MS. PERATIS:  Okay.

dalco
court reporting & legal video

**MARY ROZELL**

96

1    Q.    Is that a laptop?

2    A.    No.

3    Q.    Is it a desktop?

4    A.    It's a desktop.

5    Q.    What kind of computer is it?

6    A.    It's a Mac.

7    Q.    When did you get it?

8    A.    I think, it's my husband's.  I think

9    he got it maybe in 2003. Not sure.

10    Q.    And you've used that to communicate

11    with Sasha?

12    A.    At that time, yes.

13    Q.    And currently?

14    A.    No, I don't use that computer.  I

15    got my own computer.

16    Q.    When did you get your own computer?

17    A.    I got my own computer after I was

18    fired.  I think it was August.  It was August of

19    2004.

20    Q.    And do you still have that computer?

21    A.    Yes, I do.

22    Q.    What kind of computer is that?

23    A.    It's a Sony Vio laptop.

24         MR. WEBER:  I'm going to direct that

**MARY ROZELL**

 1    Shawn but I assume I was asking him about my

 2    documents.

 3         Q.    And was Shawn employed by Andco at

 4    the time?

 5         A.    No.

 6         Q.    Was he an independent IT person?

 7         A.    Yes.

 8         Q.    What did he say to you?

 9               MS. PERATIS:  If you recall.

10         A.    I don't recall.  I can just

11    interpret from what he, what I wrote here.

12         Q.    How were you able to reach him?

13         A.    I don't remember.

14

15                    (Defendants' Exhibit Q,

16                     E-MAIL, was marked for

17                     identification.)

18

19         Q.    I show you Defendants' Q for ID,

20    identify that document.

21               MS. PERATIS:  Do you have a

22         question?

23         Q.    Can you identify it?

24         A.    It's an e-mail from me to Tasha, and

**MARY ROZELL**

1    I think this is referring to --

2                    MS. PERATIS:  Wait for a question,

3        Mary.

4        A.    Oh.

5                    MR. WEBER: Oh, that's my -- thank

6        you.

7        Q.    It says -- what are you referring

8    to; "I think it's a little creepy, reading these

9    again"?

10                   What is that referring to?

11       A.    Not exactly sure.  I think it's

12   referring to -- I think Leah requested documents

13   from Tasha after she left.

14       Q.    What documents?

15       A.    I don't recall.

16       Q.    What does the phrase, "like you are

17   being set up" refer to?

18       A.    I don't know.

19       Q.    Well, you wrote it so from your best

20   recollection?

21       A.    I'm trying to remember.

22       Q.    You say, quote, I say screw your

23   severance agreement, end of quote.  Why were you

24   suggesting not to take the severance?

MARY ROZELL

102

1          A.    Oh, because the severance --
2     severance agreement said something about she
3     would agree to consult with them or provide them
4     with information and I think they wanted her help
5     or information about something.
6          Q.    Did she eventually sign a severance
7     agreement?
8          A.    I think that she did, yes.
9
10                         (Defendants' Exhibit R,
11                         E-MAIL, was marked for
12                         identification.)
13
14         Q.    I show you Defendants' Exhibit R for
15    identification.  Can you please describe it?
16         A.    This was an e-mail from me to Tasha
17    and --
18         Q.    The phrase, "Will you be able to
19    perform upstairs?  Remember AOL works for me
20    too," what was that referring to?
21         A.    Would she be able to get my things.
22         Q.    The phrase, "Did Shawn not come by
23    at all, question mark," what did that refer to?
24         A.    I think Shawn -- Shawn came by

MARY ROZELL

1          Q.    I show you Defendants' Exhibit S for

2     identification.  Can you identify it?

3          A.    Yes, it's an e-mail from me to Tasha

4     that same day.

5          Q.    It says, "How do they know?"

6          A.    Uh-hum.

7          Q.    How do they know what?

8          A.    Well, how do they know that I wanted

9     her to go and get my things?

10         Q.    What did she say?

11         A.    H'mm?

12         Q.    What did she say, if anything, in

13    response?

14         A.    I don't -- I don't remember.  I

15    remember we were questioning why Tasha was being

16    not spoken to and why she was being not allowed

17    to move.  We didn't understand.

18         Q.    What does that mean, "not allowed to

19    move"?

20         A.    She wasn't allowed to leave her

21    office.  She was being watched.  She was told

22    that she couldn't leave the room.

23         Q.    So you're saying "how did they know"

24    meaning --



MARY ROZELL

1          A.    It was on the first floor.

2

3                      (Defendants' Exhibit T,

4                       E-MAIL, was marked for

5                       identification.)

6

7          Q.    I show you Defendants' T for

8    identification.  Can you identify the document?

9          A.    It's an e-mail from me to Tasha the

10   same day.

11         Q.    And what was the -- what were you

12   referring to here?  It says, "How do you know

13   it's locked?" What was locked?

14         A.    I'm not sure.  I assume it means the

15   apartment upstairs.

16         Q.    Was there a way to lock the 13th

17   floor from the 12th or do you mean from the 1st

18   floor to the 12th?

19         A.    Pardon?

20         Q.    What are you referring to as "How do

21   you know it's locked"?

22         A.    I assume it means the 12th floor

23   entrance.  It was not usually locked.

24         Q.    And the phrase, "Why do you think

MARY ROZELL

1      she does not want you up there," what does that

2      refer to?

3              A.    It means why, why do you think she

4      doesn't want you up there, I assume it's Leah.

5      Tasha regularly -- Tasha and Leah regularly came

6      to my office.

7              Q.    From the first floor?

8              A.    Yes.

9              Q.    To the 12th floor?

10             A.    Yes.

11             Q.    To work on business?

12             A.    Yes, and to -- I kept certain things

13     up there.  Sometimes they would need a certain

14     binder, information.

15             Q.    Related to the art collection?

16             A.    Yes.

17             Q.    During the period of time -- strike

18     that.

19                   What day were you terminated?

20             A.    I was terminated on Wednesday, April

21     28th.

22

23                         (Defendants' Exhibit U,

24                          E-MAIL, was marked for

**MARY ROZELL**

108

1               identification.)

2

3          Q.    Defendants' Exhibit U for

4     identification.

5               Can you identify that document?

6          A.    It's the same day; an e-mail from me

7     to Tasha.

8          Q.    Can I assume that in -- there's a

9     response from Tasha to every one of these

10    e-mails?

11         A.    A response from Tasha?  Yes, there

12    was.

13         Q.    And what was the purpose of this

14    e-mail?

15         A.    Again, we're just wondering why

16    they're not letting Tasha go upstairs.  What do

17    they think that we're doing?  Why are they

18    afraid?  And then I advised her to just forget

19    about trying to get my things, leave.

20

21                    (Defendants' Exhibit V,

22                    E-MAIL, was marked for

23                    identification.)

24



MARY ROZELL

1          Q.    Defendants' Exhibit V for

2    identification.  Can you identify that document?

3          A.    It's an e-mail between, from me to

4    Tasha, that same evening.

5          Q.    And what were you saying to Tasha

6    here?

7          A.    I'm still asking her to get my

8    things.

9          Q.    You're saying that she's entitled to

10   go up there?

11         A.    Yes.

12         Q.    And what -- what's the basis for

13   your belief that she's entitled to go up there?

14         A.    Because she was an employee of the

15   company.

16         Q.    Is her office on the first floor?

17         A.    Yes.

18

19                    (Defendants' Exhibit W,

20                    E-MAIL, was marked for

21                    identification.)

22

23         Q.    I show you Defendants' W for

24   identification.  Can you tell me what it is?

dalco
court reporting & legal video

**MARY ROZELL**

110

1          A.     It's an e-mail from me to Tasha

2     about the same subject.

3          Q.     When you say, "Yes, by all means

4     keep pissing her off," who are you referring to?

5          A.     I'm referring to Leah.

6          Q.     And "Klaus is probably pulling out

7     the whip." Who is Klaus?

8          A.     Klaus is Leah's boyfriend who would

9     be very angry if she left after 6.

10         Q.     When it says, "You have a right to

11    all documents" what are you referring to?

12         A.     She has a right to -- she has a

13    right to look at documents.

14         Q.     Which documents?

15         A.     All documents.

16         Q.     All Andco documents?

17         A.     Well, the ones that we used.

18         Q.     When you say, "Tell me if you want

19    Bill --" that's your husband?

20         A.     Yes.

21         Q.     "-- to call 71st Street to see if

22    Krystie is hiding up there."

23         A.     Uh-hum.

24         Q.     What were you referring to there?

MARY ROZELL

111

1          A.    They had Krystie upstairs.  I think

2    what Tasha had told me is that they had Krystie

3    upstairs making sure Tasha didn't go in the

4    apartment.  But I don't think -- nothing was

5    said.

6          Q.    When you say "nothing was said,"

7    meaning what?

8          A.    My understanding is that Tasha was

9    not told she couldn't go in the apartment.  They

10   were just not letting her.

11         Q.    She had no reason to be up there,

12   did she?

13         A.    She came to my office every day

14   so --

15         Q.    But you weren't there?

16         A.    She went to my office when I wasn't

17   there as well.

18

19                      (Defendants' Exhibit X,

20                      E-MAIL, was marked for

21                      identification.)

22

23         Q.    I'm showing you Defendants' Exhibit

24   X for identification.  Can you tell me what that

**MARY ROZELL**

1    is?

2          A.    It's an e-mail to Tasha about

3    getting my files again, yeah.

4          Q.    And what are you suggesting, your

5    husband Bill --

6          A.    Uh-hum.

7          Q.    Said "our," meaning yours and his?

8          A.    Uh-huh.

9          Q.    Plan was that you --

10         A.    I think it was mine and Tasha's; I'm

11   not sure.

12         Q.    Wait, "Bill said our plan was that

13   you would tell Shawn," you meaning Tasha, "that

14   you needed him to copy my files for your use

15   downstairs."

16         A.    Uh-hum, right.

17         Q.    What -- was that your work related

18   files?

19         A.    No.

20         Q.    Why would Tasha need your personal

21   files to work downstairs?

22         A.    I don't know.  I didn't want to put

23   Shawn in an awkward position.

24         Q.    You already asked him to get your

MARY ROZELL

1    files, right?

2        A.    I don't think I asked him at that

3    point.  I don't remember.

4        Q.    Well, you knew that Tasha had asked

5    him?

6        A.    I don't know when Tasha asked him.

7        Q.    At some point she asked him; right?

8        A.    Yes, at some point she did.  I think

9    Shawn came in at the end of that day.

10

11                     (Defendants' Exhibit Y,

12                      E-MAIL, was marked for

13                      identification.)

14

15        Q.    I show you Defendants' Exhibit Y for

16    identification.  Tell me what that is.

17        A.    It's a letter -- it's an e-mail from

18    me to Tasha the day after I was fired.

19        Q.    To ask her to start copying records?

20        A.    To start copying her things, yes.

21        Q.    Did she?

22        A.    I don't know if she did.

23        Q.    You were talking to her fairly

24    regularly, weren't you?

MARY ROZELL

121

1          A.     Right.

2          Q.     You're unaware of his information?

3          A.     Well, I had no information with me

4     at home.

5          Q.     You didn't know his e-mail address?

6          A.     I knew his e-mail but I didn't know

7     his number.

8          Q.     But you didn't put his e-mail

9     address in there, did you?

10          A.     I guess not.

11          Q.     When Marisa left did you start

12     reporting directly to Ms. Ross-Holst?

13                 MS. PERATIS:  Objection.

14          A.     I thought I was always reporting

15     directly to her.

16          Q.     To Ms. Ross-Holst?

17          A.     Yeah.

18          Q.     And Ms. Ross-Holst never told you

19     anything to the contrary, did she?

20          A.     Other than that I would also be

21     reporting to Catherine Stanke.

22          Q.     Right; other than that?

23          A.     No.

24          Q.     Okay.  During your employment at

dalco
court reporting & legal video

MARY ROZELL

126

1        Q.    Who was that?

2        A.    Sanjay Tockor.

3        Q.    And why did you do that?

4        A.    Because I felt he was lazy and he

5    wasn't accomplishing his work and because he was

6    looking at porn on his computer.

7        Q.    Is that prohibited at the company?

8        A.    No, but I didn't think it was

9    appropriate.

10       Q.    Anyone else you terminate?

11       A.    No.

12       Q.    You mentioned before that you went

13    on   maternity leave?

14       A.    Yes.

15       Q.    I believe; and when was that?

16       A.    It started on January 23, I believe.

17       Q.    What year?

18       A.    2003.

19       Q.    Were you out before that leave for

20    any purpose?

21       A.    Yes, I was on bed rest and in the

22    hospital.

23       Q.    And when were you out?

24       A.    Some time -- it started early

MARY ROZELL

127

1    November of 2002.

2              Q.    And how long were you out of work?

3              A.    You mean on bed rest?

4              Q.    Correct.

5              A.    Until -- I was not in the office up

6    through the birth of my child.

7              Q.    Which was when?

8              A.    The 22nd of January.

9              Q.    22nd of January; and then did you --

10   you didn't come back to the office for your

11   birth; you went on a maternity leave, I presume?

12             A.    Uh-hum.

13             Q.    And how long was the maternity

14   leave?

15             A.    Three months.

16             Q.    And was that a paid or unpaid?

17             A.    Maternity leave?

18             Q.    Yes.

19             A.    It was -- the first six weeks were

20   paid.

21             Q.    And do you recall when you returned

22   from maternity leave?

23             A.    I don't -- it was mid-April of 2003.

24             Q.    Okay.  And were you paid when you

MARY ROZELL

128

1    were out on bed rest?

2          A.    Yes.

3          Q.    Was that in the company policy?

4          A.    There was no policy at that time.

5          Q.    Did the company have to pay you when

6    you're out on bed rest?

7                MS. PERATIS:  Objection.

8          Q.    If you know.

9          A.    I don't know.

10         Q.    Do you know if there was any

11   obligation to pay you?

12         A.    I don't know if there was an

13   obligation but I was working.

14         Q.    Working from home?

15         A.    Yes.  That's why I had all the

16   binders and papers and the computer.

17         Q.    And you returned them, though, when

18   you came back?

19         A.    Yes.

20         Q.    So you were out from some time in

21   early November to mid-April?

22         A.    Yes.

23         Q.    And part of that time you were

24   working from home?



MARY ROZELL

129

1          A.     Yes.

2          Q.     During your maternity leave of three

3    months were you also working during that time?

4          A.     Sometimes.  I wasn't supposed to be

5    but I was.

6          Q.     How much -- what portion of your

7    time at home were you working?

8          A.     During my maternity leave?

9          Q.     Correct.

10         A.     I talked to the staff several times

11   a week.  Sometimes I had to do other things, come

12   in for meetings.  I had to meet Anders Holst to

13   help him buy a gift once.  There were certain

14   things I needed to do during that leave.

15         Q.     Okay.  You came back in -- I believe

16   you said mid-April 2003?

17         A.     Yeah.

18         Q.     Did you come back part time?

19         A.     Yes.

20         Q.     And whose idea was that?

21         A.     It was my idea.

22         Q.     And you requested part-time work?

23         A.     Yes, I did.

24         Q.     Did you request working three days a

MARY ROZELL

1    week?

2          A.    Yes.

3          Q.    And who did you have these

4    discussions with?

5          A.    I believe it was Neil Pirozzi and

6    Marisa.

7          Q.    Who did you first initiate the

8    conversations with?

9          A.    Those two.

10         Q.    At the same time or --

11         A.    I don't remember.

12         Q.    And what did you say?

13         A.    I asked if it would be possible to

14   work part time.

15         Q.    And what did they say?

16         A.    I felt that it would be mutually

17   beneficial and they agreed.

18         Q.    And did you have a discussion about

19   your salary?

20         A.    Yes.

21         Q.    And what did you say to them, what

22   did they say to you?

23         A.    I don't remember exactly but there

24   was just a back and forth in terms of how much I

MARY ROZELL

1    should be paid.

2            Q.    Did you propose an amount?

3            A.    I'm not sure if I proposed it or if

4    they did.

5            Q.    Well, you were going to work three

6    days?

7            A.    Uh-hum.

8            Q.    So that would be 60 percent?  Three

9    fifths being 60 percent?

10           A.    It was three days officially but it

11   was with an understanding that I would be working

12   a lot more than three days.

13           Q.    Was your part-time salary greater

14   than 60 percent of your full-time salary?

15           A.    Yes.  I believe, uh-hum.

16           Q.    And this arrangement was suitable to

17   you?

18           A.    Yes.

19           Q.    And you were receiving your full

20   benefits as well?

21           A.    Yes.

22           Q.    Did there come a time you took a

23   vacation in mid 2003?

24           A.    Mid 2003?  I don't recall but --

MARY ROZELL

134

1          Q.    Uh-huh.

2          A.    I don't recall exactly what we

3    discussed.

4          Q.    Did you ever discuss any work

5    related information with him after you were

6    terminated?

7          A.    After I was terminated I told him

8    that I was terminated.

9          Q.    What did else did you tell him?

10         A.    I told him -- I described how I was

11   terminated.

12         Q.    What did you tell him?

13         A.    I think -- I told him that I was

14   offered a severance agreement that I didn't sign

15   and I believe I told him that I was treated more

16   or less like a criminal and that's about it.  I

17   asked him at some point about -- if he remembered

18   anything about our private accounts being paid

19   for by the company.

20         Q.    What private accounts?

21         A.    Our e-mail accounts.

22         Q.    What did he say?

23         A.    He told me that he remembered.

24         Q.    That the company paid for the e-mail

MARY ROZELL

135

1    accounts?

2        A.    Right.

3        Q.    What else did you say to him?

4        A.    I don't recall.  We talk about his

5    family and his jobs.

6        Q.    His family?

7        A.    Yes.

8        Q.    And his job?

9        A.    Uh-hum.

10

11              (Defendants' Exhibit EE,

12              E-MAIL, was marked for

13              identification.)

14

15       Q.    I show you Defendants' Exhibit EE

16   for identification.  Can you identify that

17   document?

18       A.    Yes, this is an e-mail to Steve from

19   me after I was fired.

20       Q.    Did he send you an e-mail?

21       A.    I assume so.

22       Q.    Do you have that e-mail?

23       A.    I don't think so.

24              THE WITNESS:    Do we have it?

MARY ROZELL

137

1              A F T E R N OO N   S E S S I O N

2

3              (Time noted:  1:10  p.m.)

4

5         MARY ROZELL

6         resumed and testified as follows:

7

8    CONTINUED EXAMINATION

9    BY MR. WEBER:

10        Q.    When did you first meet Neil

11   Pirozzi?

12        A.    Sometime in the fall of 2002.

13        Q.    What were the circumstances of that

14   first meeting?

15        A.    He came to 71st Street to have a

16   meeting with me.

17        Q.    What was --

18        A.    To introduce himself, to talk about

19   general things that we would be working on

20   together.

21        Q.    And did Ms. Ross-Holst tell you

22   about Neil and that you were going to meet with

23   him?

24              MS. PERATIS:  Objection.

dalco
court reporting & legal video

MARY ROZELL

138

1          A.    I don't recall.

2          Q.    Do you recall how that meeting was

3    arranged?

4          A.    I don't.  He may have called me and

5    arranged it himself.

6          Q.    Did you understand what his title

7    was?

8          A.    Yes.

9          Q.    What was that?

10         A.    We knew that a CFO was being hired.

11         Q.    He was hired for the Ross School or

12   for Andco --

13         A.    I believe it was Andco.

14         Q.    And did you meet with him on the

15   fall of '02?

16         A.    Yes, sometime.

17         Q.    Where did you meet?

18         A.    In one of the kitchens.

19         Q.    At 71st Street?

20         A.    Yes.

21         Q.    And who was present, if anyone,

22   besides you and Neil?

23         A.    It was just us.

24         Q.    And how long did that meeting take?

MARY ROZELL

1         A.    I don't recall exactly.  Maybe 40

2    minutes, something like that.

3         Q.    And what if anything was discussed?

4         A.    I believe that we just generally

5    talked about the assets being the art and the

6    foundation.  I filled him in, I think I was

7    filling him in, debriefing him on what, what part

8    of my job, my work, was related to his work.

9         Q.    Did you do most of the talking?

10         MS. PERATIS:  Objection.

11        A.    I don't recall.  I don't think so.

12        Q.    Did he tell you what his

13   understanding of what his job was?

14        A.    I don't recall.

15        Q.    Was he there for -- only to meet

16   with you or for other purposes?

17         MS. PERATIS:  Objection.

18        A.    I don't know.

19        Q.    Do you know if he met with anyone

20   else when you were there?

21        A.    I don't know.

22        Q.    Did you see him at the apartment

23   before or after your meetings?

24         MS. PERATIS:  You mean the same day?

dalco
court reporting & legal video

MARY ROZELL

140

1              MR. WEBER:  Correct.

2         A.   I don't recall.  I don't know.

3         Q.   And how would you describe the --

4    that meeting?

5         A.   It was cordial.

6         Q.   Cordial.

7              After that fall meeting in '02

8    when's the next time when you met with Mr.

9    Pirozzi?

10        A.   I don't remember.

11        Q.   Approximately.

12        A.   Maybe the next week.

13        Q.   Did you have an understanding what

14   your working relationship would be with the CFO

15   of Andco?

16        A.   I had a fairly good understanding.

17        Q.   And what was that?

18        A.   It was based on the previous two

19   CFOs that were there.

20        Q.   And do you, you understood that your

21   relationship would be similar -- working

22   relationship would be similar with Mr. Pirozzi as

23   it was with the prior CFOs?

24        A.   I assumed.



MARY ROZELL

1    understand the value of the art in the

2    foundation?

3              A.    Right.   There was also insurance

4    issues.

5              Q.    And he was involved in that?

6              A.    Yes.

7              Q.    Was there an understanding you would

8    have regularly scheduled meetings?

9              A.    Yes.   Not necessarily scheduled

10   meetings but regular communication.

11             Q.    Be it weekly, monthly, whatever?

12             A.    Yeah.

13             Q.    At least once or twice a month,

14   would that be a fair statement?

15             A.    At least.

16             Q.    Sometimes once a week?

17             A.    Yes.

18             Q.    And what, generally, did you discuss

19   at the meetings you had with Mr. Pirozzi?

20                   MS. PERATIS:   Objection.

21             Q.    You can answer.

22             A.    What generally we discussed?

23             Q.    In other words, were there set

24   topics of discussion of areas of concern that

MARY ROZELL

1          A.    And I think the accounting --

2    accounting wanted to give us a certain amount of

3    money per month.  We submitted receipts and then

4    we'd get $300 and then it was $15 a day, and that

5    didn't work out so we went back to the old

6    system, something like that.  There was a big

7    back and forth about this issue.

8          Q.    Any other specific issues that you

9    remember being part of the discussions you had

10   with Mr. Pirozzi?

11         A.    I'm sure there were many but I can't

12   recall right now.

13         Q.    And did you always meet with him at

14   71st Street?

15         A.    Primarily.

16         Q.    Where was his office?

17         A.    His main office was in East Hampton.

18         Q.    East Hampton?

19         A.    Uh-hum.

20         Q.    New York?

21         A.    Uh-hum.

22         Q.    And -- okay.

23               And the second meeting you had with

24   him?



MARY ROZELL

149

1      A.    No.

2      Q.    Did there come a time when that

3  changed?

4      A.    Yes.

5      Q.    When was that?

6      A.    It changed after my meeting with

7  Mrs. Ross-Holst.

8      Q.    And that was in January of 2004?

9      A.    Yes.

10     Q.    Up until that time the meetings were

11  cordial?

12     A.    Generally.

13     Q.    Generally.  You didn't express any

14  complaints about his performance prior to that

15  time; is that correct?

16     A.    About his performance?

17     Q.    I'm sorry, about his behavior.

18     A.    I did express --

19     Q.    You did?

20     A.    -- complaints, yes.

21     Q.    When were  when --

22     A.    But not formal complaints.

23     Q.    Who did you express them to?

24     A.    To my staff.

dalco
court reporting & legal video

MARY ROZELL

150

1       Q.      When was that?

2       A.      The first time was the first time I

3    met Mr. Pirozzi.

4       Q.      In?

5       A.      The fall of 2002.

6       Q.      During the meeting that you said was

7    cordial?

8       A.      Yes.

9       Q.      What did you say to your staff?

10      A.      I said -- I gave them a general

11   report on the new CFO.  Everyone was curious, and

12   I told them that, generally, I thought it was

13   positive and it was a good thing.  We all were

14   waiting quite a while for a new CFO, and we

15   needed one, but I told them that I had a little

16   concern about a comment that he made to me.

17      Q.      And what was that comment that you

18   expressed to your staff?

19      A.      That what I said to my staff?  I

20   don't remember verbatim but I told them that I

21   felt that Mr. Pirozzi had made some inappropriate

22   comments and I was wor- -- a little worried about

23   that.

24      Q.      And what were those comments?

MARY ROZELL

151

1        A.    I don't remember verbatim but it was

2    something about my body, about my having a nice

3    body, and I was quite pregnant at the time and

4    that was disturbing to me.

5        Q.    What else did he say that you

6    recall?

7        A.    I don't recall anything --

8        Q.    And who did you relate this comment

9    to?

10       A.    Tasha and Leah or just Tasha.  I'm

11   not sure.  I think it was both of them.

12       Q.    And did she say anything in response

13   when you related that story?

14       A.    I don't recall what they may have

15   said.

16       Q.    Did that offend you?

17       A.    What.

18       Q.    What he said to you?

19       A.    Yes, it offended me.

20       Q.    Why was that?

21       A.    I don't like people commenting on my

22   body unless it's -- well, I don't like --

23   especially co-workers.  I didn't think it was

24   appropriate.



MARY ROZELL

1         Q.   Did you say anything to anyone other

2  than Tasha or Leah?

3         A.   No.

4         Q.   Did there come a time after that

5  when he made what you viewed an inappropriate

6  comment?

7         A.   Yes.

8         Q.   When?

9         A.   Often.

10        Q.   How often?

11        A.   Almost every time I saw him.

12        Q.   And what would he say?

13        A.   He would tell me I looked great,

14  tell me I had a great body, things like that.

15        Q.   What did you say in response to

16  them?

17        A.   I would --

18        Q.   If anything.

19        A.   Well, I would get embarrassed and I

20  would change the subject.  Sometimes I would just

21  say, shut up, Neil, or be quiet.

22        Q.   What else did you say, if anything?

23        A.   I think that's about it.

24        Q.   Did anybody else make comments in

MARY ROZELL

1      Q.    And did you relay those comments to

2   anyone else or anyone after he made the comments?

3

4      A.    Not usually, no.

5      Q.    There came a point where you just

6   didn't comment to anyone after he made an alleged

7   comment?

8            MS. PERATIS:  Objection.

9      A.    No, I wouldn't say that.  There were

10  times when I would mention it.

11     Q.    To whom?

12     A.    To Tasha and Leah.

13     Q.    Anybody else?

14     A.    No.

15     Q.    How often did you mention it to

16  Tasha and Leah?

17     A.    A few times.  Maybe -- I don't know

18  how often, exactly.

19     Q.    Did this -- did these comments

20  continue on through your employment?

21     A.    They stopped when Neil essentially

22  stopped talking to me.

23     Q.    And when was that?

24     A.    After my meeting with Mrs.

dalco
court reporting & legal video

MARY ROZELL

1      Ross-Holst.

2            Q.    In January of 2004?

3            A.    Yes.

4            Q.    Between the fall of 2002 and January

5      2004, on how many occasions did Mr. Pirozzi make

6      what you would consider inappropriate comments

7      about your body?

8                  MS. PERATIS:  Objection.  Asked and

9            answered.

10           Q.    You can answer.

11           A.    I don't know the exact number.

12           Q.    Approximately.

13                 MS. PERATIS:  Don't guess.  To the

14           best you can.

15           Q.    More than five?

16           A.    Yes.

17           Q.    More than ten?

18           A.    Yes.

19           Q.    More than 20?

20           A.    I don't know.

21           Q.    Between ten and 20?

22                 MS. PERATIS:  The witness said she

23           doesn't know.

24                 MR. WEBER:  I have a right to pry.

MARY ROZELL

156

1        A.    I don't know.

2        Q.    Best guess.  Best estimate.

3        A.    20.

4        Q.    Okay.  After each of these

5   conversations where Mr. Pirozzi allegedly

6   commented about your body, did you relate each of

7   those conversations with Leah and/or Tasha?

8        A.    No.

9        Q.    Half of them?

10       A.    Probably not.  I'm not sure.

11       Q.    Okay.  Did you ever tell Ms. Ross

12  about the comments?

13       A.    Not until my meeting with her.

14       Q.    Did you ever tell Marisa about the

15  comments?

16       A.    No.

17       Q.    Did you ever tell anybody other than

18  Tasha and/or Leah about them?

19       A.    Not in the workplace, no.

20       Q.    Okay.  We'll get to outside the

21  workplace in a minute.

22            Other than Neil allegedly saying to

23  you you have an attractive body or you look

24  great, what else did he say?

MARY ROZELL

1          A.     He asked me a lot of questions about

2    my private life.

3          Q.     Did you tell him?

4          A.     Sometimes I would answer.

5          Q.     Did you ever share with him personal

6    things about your life?

7          A.     Not things that I deemed really

8    personal.

9          Q.     Did you ever tell him about your

10   husband?

11         A.     Yes, he was always interested in --

12   as to why I wasn't married.

13         Q.     Did you ever share some personal

14   details with Neil?

15         A.     What do you mean by personal?

16         Q.     About your personal life?

17         A.     We talked about whether or not --

18   why I wasn't married, things like that.

19         Q.     Did you tell him why you thought you

20   weren't married?

21         A.     H'mm?

22         Q.     Did you tell him why you thought you

23   weren't married?

24         A.     I recall telling him that I didn't

MARY ROZELL

158

1    want to get married.

2            Q.    Did you tell him that on a couple of

3    occasions?

4            A.    I'm not sure.

5            Q.    Did you ever share any other

6    personal details with Mr. Pirozzi?

7            A.    There was small talk about our

8    children.

9            Q.    Before you had children did you ever

10   talk about any other personal details?

11           A.    I don't recall.

12           Q.    Did you ever share with him about

13   any dating you were experiencing?

14           A.    I don't think so, no.

15           Q.    Did you ever talk to him about any

16   other personal things in your life?

17           A.    I'm sure I probably mentioned that

18   my mother was sick.

19           Q.    Any other discussions about your

20   family?

21           A.    I don't recall.

22           Q.    Any discussions about your siblings?

23           A.    I don't think so.

24           Q.    Any discussions about female

MARY ROZELL

159

1    friends?

2         A.    I don't think so.

3         Q.    Any discussions about travel?

4         A.    I would tell him when I was going

5    away, yeah.

6         Q.    Any discussions about the trips you

7    took?

8         A.    Yeah, I think there was small talk;

9    did I have a good time, that sort of thing.

10         Q.    Any discussion about art?

11         A.    About art?

12         Q.    Art, and not in the formal business

13    sense but art appreciation, things you liked?

14         A.    Oh, I think, yeah, we talked about

15    art.

16         Q.    Any --

17         A.    I would try to -- yeah, I liked to

18    talk about the collection.

19         Q.    Did you educate him?

20         A.    Well, no, but he seemed to be

21    interested sometimes.  I think his mother wanted

22    to see the collection or something.

23         Q.    Did you ever take his mother to the

24    collection?



MARY ROZELL

1           A.    I don't remember.  I don't think so.

2           Q.    Did you ever show her around the

3    apartment?

4           A.    I don't think so.  I don't remember.

5           Q.    Did you ever talk to him about his

6    personal life?

7           A.    He talked to me about his personal

8    life.

9           Q.    Did he share details about his

10   marriage?

11          A.    He would tell us things, yes.

12          Q.    About his wife?

13          A.    Yes, he would talk about his wife.

14          Q.    About his kids?

15          A.    Yes.

16          Q.    About his family?

17          A.    His wife and kids.

18          Q.    About any personal interests?

19          A.    Personal interests, I don't recall.

20          Q.    Would you consider that you had a

21   friendly relationship with Mr. Pirozzi?

22          A.    I think I had a cordial relationship

23   with him.

24          Q.    Did you think you had a friendly

MARY ROZELL

1    relationship?

2        A.    I think I had a cordial business

3    relationship with him.

4        Q.    Did you consider him a friend?

5        A.    No.

6        Q.    Never referred to him as a friend?

7        A.    No.

8        Q.    Never said to anybody that he was a

9    friend, you had a friendly relationship?

10        A.    I may have said I had a friendly

11    relationship, I don't know, but I've never

12    referred to him as a friend.

13        Q.    But you may -- you may not recall

14    that you may have referred to your relationship

15    as friendly?

16        A.    Well, if someone -- I don't recall,

17    but I'm saying it's possible if someone said do

18    you have a friendly relationship that I might

19    have said yes.

20        Q.    Did you ever send cordial e-mails to

21    him?

22        A.    I would think so.

23        Q.    E-mails that were friendly in tone?

24        A.    Well, I think I sent cordial e-mails

MARY ROZELL

162

1     to everyone I worked with.

2          Q.     Other than --

3          A.     I tried my best.

4          Q.     Other than the statements you made

5     about his comments about your physical

6     appearance, did he make any other comments to you

7     about --

8          A.     Other comments?

9          Q.     That you thought were offensive.

10         A.     There were actions I thought were

11    offensive.

12         Q.     Such as -- well, first let's take --

13    were there any comments you thought were

14    offensive?

15         A.     I was a little offended by some

16    comments he made about his wife.

17         Q.     What did he say?

18         A.     He would tell us how he slept on the

19    couch, and he kind of painted a picture of

20    resentment about his wife not working, him having

21    to pay all the bills, that sort of thing.

22         Q.     Did you respond to those comments?

23         A.     I don't recall.

24         Q.     Did you ever share any similar

MARY ROZELL

1    details with him about your marriage?

2              A.     I remember saying that that's the

3    reason why I wouldn't ever not want to have a

4    job.

5              Q.     Why is that?

6              A.     Because I wouldn't want my husband

7    resenting me.

8              Q.     Did you ever tell Mr. Pirozzi that

9    your husband wanted to charge you for certain

10   expenses at home?

11             A.     No, I don't think so.

12             Q.     Words to that effect?

13             A.     I don't think so.

14             Q.     You never made that comments to

15   anybody about your husband wanted to charge you

16   for things at home?

17             A.     Charge me?

18             Q.     Yeah.

19             A.     What do you mean by charge me?

20             Q.     You should pay for certain things in

21   your home?

22             A.     I paid rent.  I paid a share of our

23   expenses.

24             Q.     Did your husband ask you to pay a

dalco

court reporting&legal video

MARY ROZELL

168

1        Q.    That's all you can think of?

2        A.    Right.

3        Q.    And you've reviewed these documents

4    recently; right?

5        A.    Yes.

6        Q.    And these events occurred in 2002

7    and 2003?

8        A.    Uh-hum.

9        Q.    None in 2004; correct?

10       A.    Right.

11

12                   (Defendants' Exhibit FF,

13                   E-MAIL, was marked for

14                   identification.)

15

16       Q.    I show you what's been marked

17    Defendants' Exhibit FF for identification.  Tell

18    me what that is.

19       A.    It's an e-mail from me to Mr.

20    Pirozzi.

21       Q.    What is it related to?

22       A.    I believe it's related to a meeting

23    we were supposed to have.

24       Q.    When you say, "You bet I'm wondering

dalco
court reporting & legal video

MARY ROZELL

1    where you are, exclamation mark," what were you

2    referring to?

3         A.    I think I was referring to him not

4    coming for the meeting.

5         Q.    There's a little colon and an end

6    parenthesis, I'm not computer language savvy, but

7    I think that means something; right?

8         A.    Uh-hum.

9         Q.    What does that mean?

10        A.    It looks like a smiley face.

11        Q.    Smiley face.  I always wanted to

12    know what that was.

13              So that's just like a smiley face,

14    like, when I was growing up the old kind of

15    smiley face but that's the new version; right?

16        A.    Your guess is as good as mine.

17        Q.    Well, you typed that; right?

18        A.    Yes, I did.

19        Q.    In your understanding that was meant

20    to be a smiley face?

21        A.    I think so.

22        Q.    Friendly?

23        A.    I would say it was friendly, yes.

24        Q.    "Wednesday looks great for me, keep