EXHIBIT 9    (PART III)

MARY ROZELL

180

1          A.    The beginning of the year.

2          Q.    January?

3          A.    Yes.

4          Q.    What raise were you supposed to get?

5          A.    It was, generally it was a two to

6    three percent raise.

7          Q.    You got a raise in the previous

8    years?

9          A.    I got a raise the first year I was

10   there.  The second year I was there we were told

11   that the raises were forgotten, so this was an

12   issue I brought up with Mr. Pirozzi on several

13   occasions on behalf of the entire staff.

14         Q.    Nobody got raises?

15         A.    In 2003.  I'm not sure but I think

16   that's what happened.

17         Q.    Is that related to Ms. Ross's

18   financial situation?

19         A.    I don't know.  The first year we

20   were told that our raises were small because of

21   her financial situation.  The second year nothing

22   was said.

23         Q.    Other than that comment that you had

24   that Mr. Pirozzi shared with you about raises, do

MARY ROZELL

1    you remember any other conversations other than

2    what you've discussed that you thought were

3    inappropriate or offensive to you in 2004?

4         A.    We had another telephone

5    conversation in April.

6         Q.    April when?

7         A.    2004.

8         Q.    And what was discussed?

9         A.    In my absence -- I went on vacation

10    in early April, and in my absence he had meetings

11    with both of my staff members, Tasha and Leah.

12    And in the meeting with Tasha he indicated to her

13    that he could give -- that he could get rid of

14    Leah if that's what it took for Tasha to stay on.

15         Q.    During your absence he had a

16    conversation with Tasha?

17         A.    Yes.

18         Q.    And said to Tasha that he would fire

19    Leah if it would encourage her to stay?

20         A.    He indicated that it was a

21    possibility.

22         Q.    Is that because of the conflict

23    between Leah and Tasha?

24         A.    He asked Tasha what it would take

MARY ROZELL

182

1    for her to stay, and she gave him a list of

2    reasons, I believe, why she was leaving and that

3    was one thing that he said to her.

4            Q.    Do you know what else she said were

5    the reasons she wanted to leave?

6            A.    I believe had to do with Darius's

7    behavior.

8            Q.    What was that behavior?

9            A.    Just general behavior.

10           Q.    General behavior?

11           A.    Uh-hum.

12           Q.    Not good, not bad, just general?

13           A.    Well, he could be abusive.

14           Q.    Give me an example.

15           A.    He would threaten people that he

16    would tell on them, he would tell -- accuse

17    people of taking things, he would -- he was, he

18    could be very difficult.

19           Q.    What other reasons do you recall

20    Tasha listed as reasons she wanted to leave?

21           A.    I don't know.

22           Q.    That's all you recall?

23           A.    That was just my conversation with

24    her.



MARY ROZELL

183

1        Q.    You liked Tasha didn't you?

2        A.    Yes.

3        Q.    Friendly with her?

4        A.    Yes.

5        Q.    Still friendly with her?

6        A.    Yes.

7        Q.    And Tasha had a problem with Leah;

8    right?

9        A.    I think it was more the other way

10   around.

11       Q.    In either event the two of them had

12   a conflict?

13       A.    They had a conflict towards the end.

14       Q.    They weren't working well together;

15   isn't that a fair statement?

16       A.    It's not that they weren't working

17   well together because they were both doing their

18   jobs and doing a good job --

19       Q.    I understand that but there was a

20   conflict between the two of them.  I'm not

21   placing blame here.  I'm just saying there was a

22   conflict; isn't that true?

23       A.    There was a conflict. Uh-hum.

24       Q.    And Mr. Pirozzi was saying to Tasha

MARY ROZELL

1      what can I do to fix the problem, so to speak?

2           A.    Uh-huh.

3           Q.    I'll get rid of Leah.  Isn't that

4      what you're saying?

5           A.    Yes.

6           Q.    Did you find that offensive?

7           A.    Yes, I did.

8           Q.    And why was that?

9           A.    I found it offensive because I

10     didn't think it was appropriate for Mr. Pirozzi

11     to be telling one staff member of mine that he

12     would get rid of another staff member of mine.  I

13     also didn't think it was appropriate for him to

14     be making any promises to Tasha.

15          Q.    That he couldn't fulfill?

16          A.    And I also felt that he was fueling

17     the situation between them by giving Tasha a

18     substantial raise and offering her more money

19     than what he had given her.

20          Q.    That situation was pretty bad

21     between Tasha and Leah, wasn't it, at the time?

22          A.    Well, the situation initially arose

23     when I was on bed rest.  As soon as I came back

24     it was resolved.  And the situation was just --

**dalco**
court reporting & legal video

MARY ROZELL

185

1    Tasha had gotten another job offer, more money,

2    and the crux of it was Leah being jealous of

3    Tasha, and so we were trying to resolve it at

4    that time.

5            Q.    Was this disruption in the office

6    known to others besides yourself and Mr. Pirozzi?

7                    MS. PERATIS:  Objection to the

8            characterization of disruption.

9                    MR. WEBER:  I'll rephrase it.

10           Q.    Was the relationship between Tasha

11   and Leah known to others beside yourself and Mr.

12   Pirozzi?

13           A.    That I don't know.

14           Q.    Did they talk to each other in the

15   workplace?

16           A.    Who?

17           Q.    Leah and Tasha?

18           A.    Yes.

19           Q.    Was there any hostility between

20   them?

21           A.    There was hostility on a certain

22   occasion.

23           Q.    Did you ever talk to both of them

24   about their relationship between each other?

MARY ROZELL

1          A.    I talked to each of them about their

2     relationship.

3          Q.    How often?

4          A.    How often?

5          Q.    Yeah.

6          A.    Well, it wasn't necessary up until

7     the end.

8          Q.    When did the, when did their

9     relationship become less than harmonious?

10          A.    I think it was sometime in late

11    March.

12          Q.    And do you know what triggered it?

13    Was it the job --

14          A.    Tasha's raise.

15          Q.    Have you now given me all the

16    comments that you felt were inappropriate or

17    actions that were inappropriate by Mr. Pirozzi

18    towards you?

19          A.    All of them?

20          Q.    Yes.

21          A.    In the course of my employment?

22          Q.    Correct.

23          A.    No.

24          Q.    Tell me what else there was.

**dalco**
court reporting & legal video

MARY ROZELL

187

1           A.    There were occasions where Mr.

2     Pirozzi insisted on walking me to the subway.

3           Q.    When he would come to 71st Street?

4           A.    Uh-hum.

5           Q.    On the occasions that he met with

6     you?

7           A.    I don't know if we met or not.  He

8     was there.

9           Q.    And did you find that offensive?

10          A.    I found it slightly offensive.  I

11    found it unnecessary.  I told him it wasn't

12    necessary.  He would put his hands on me and I

13    found that offensive.

14          Q.    Where would he put his hands?

15          A.    On my waist.

16          Q.    In what way?

17          A.    He put his hands on his waist -- on

18    my waist when he was saying good-bye to me at the

19    subway.  He would touch me sometimes in the

20    office.

21          Q.    How often would he walk you to the

22    subway?

23          A.    Only two times that I remember.

24          Q.    Did he drive to 71st Street when he

MARY ROZELL

1    would come there?

2        A.    I don't know how he got there.

3        Q.    Do you know if he drove a car?

4        A.    I don't know.

5        Q.    Do you know if he ever walked to a

6    garage?

7        A.    I don't know.

8        Q.    So on the two occasions that he

9    walked you to the subway was it on each occasion

10   that he put his hand on your waist?

11       A.    Yes.

12       Q.    Did you find that offensive?

13       A.    Yes, I did.

14       Q.    Did you say something to him?

15       A.    No.

16       Q.    Did you say something to somebody

17   else?

18       A.    Yes.

19       Q.    Who?

20       A.    I believe I told my staff.

21       Q.    You believe you did?

22       A.    Yeah.

23       Q.    When he put his hand on your waist,

24   did you ever put your hand on his waist?

MARY ROZELL

1      A.    No.

2      Q.    You never touched him back?

3      A.    No.

4      Q.    Never put your hand on his arm,

5    elbow, shoulder?

6      A.    I don't think so.

7      Q.    Think about it.

8      A.    No, I don't think so.

9      Q.    You don't think so?

10      A.    No.

11      Q.    You're not sure, though?

12      A.    I don't think so.

13      Q.    Any other comments or actions you

14    felt were inappropriate?

15      A.    After the Christmas dinner Mr.

16    Pirozzi came behind my desk and hugged me.

17      Q.    And when was that?

18      A.    Not sure if it was in December of

19    2003 or early January, beginning of the new year.

20      Q.    And was this --

21      A.    2004.

22      Q.    -- in 71st Street.

23      A.    Yes.

24      Q.    In December?

MARY ROZELL

1      Q.    Name of the restaurant?

2      A.    I don't remember.  I don't remember.

3      Q.    Do you remember when it was?

4      A.    It was December 22nd, a Monday.

5      Q.    And what actions did -- you felt

6   were inappropriate?

7      A.    During the course of the dinner Mr.

8   Pirozzi kept telling me that he was going to walk

9   me home.  That made me nervous.  At the end of

10  the dinner he told me in front of everyone else

11  that he was going to walk me home.

12     Q.    Uh-hum.

13     A.    I told him it wasn't necessary, and

14  then he walked me home.

15     Q.    Who was at that Christmas party?

16     A.    Deidre James, Cecilia Cardam-Smith,

17  it's a double last name; Leah Ross, Tasha Seren,

18  Mr. Pirozzi.  I think Linda Beck might have been

19  there, and that might be it.  My husband and son

20  were there in the beginning.

21     Q.    They were there in the beginning?

22     A.    (Indicating yes.)

23     Q.    And they left?

24     A.    Uh-hum.

MARY ROZELL

1      Q.    Was there any drinking going on at

2  that dinner?

3      A.    Yes.

4      Q.    Did you have something to drink?

5      A.    Yes.

6      Q.    Did you have wine?

7      A.    I believe so.

8      Q.    Did you have any other alcohol?

9      A.    I don't think so.

10     Q.    How much wine did you have?

11     A.    I don't remember.

12     Q.    More than two glasses?

13     A.    I would guess two glasses.

14     Q.    Just two glasses?

15     A.    I believe.

16     Q.    You say your husband was there?

17     A.    In the beginning.

18     Q.    And your child?

19     A.    Yes.

20     Q.    This was December 2003?

21     A.    (Indicating yes.)

22     Q.    And they left?

23     A.    Yes.

24     Q.    And you said Mr. Pirozzi made these

MARY ROZELL

193

1    comments in front of others at the dinner,

2    comments that he was going to walk you home?

3         A.    I don't know -- he made the comments

4    in front of others after we'd left the

5    restaurant.

6         Q.    As you were leaving the restaurant?

7         A.    Uh-huh.

8         Q.    The group --

9         A.    As a group.  The group was --

10        Q.    Was leaving together?

11        A.    -- kind of on the corner; people

12   getting cabs.

13        Q.    He said I'll walk you home?

14        A.    Yes, something like that.

15        Q.    In front of everybody?

16        A.    (Indicating yes.)

17        Q.    And he walked you home?

18        A.    Uh-hum.

19        Q.    And did he do or say anything that

20   was inappropriate when he walked you home?

21        A.    When we got to my home, he tried to

22   kiss me good-bye.

23        Q.    On the lips or on the cheek?

24        A.    I think he was trying to kiss me on

dalco
court reporting & legal video

MARY ROZELL

1     the lips.

2           Q.    Did you kiss him back?

3           A.    No.

4           Q.    Did he kiss you?

5           A.    He kind of hit my side of my face.

6           Q.    Any doormen there?

7           A.    Yes.

8           Q.    Who's the doorman that was observing

9     this?

10          A.    I don't remember.

11          Q.    Did you ever talk to your doorman

12    about it?

13          A.    No.

14          Q.    And did you say anything at the

15    time?

16          A.    I just ran inside.

17          Q.    And did he say anything to you?

18          A.    I don't remember.

19          Q.    Any other comments or statements

20    that Mr. Pirozzi made other than what you've

21    already testified to that you found offensive?

22          A.    I don't recall.

23          Q.    Did you say anything to anybody

24    after the Christmas party about Mr. Pirozzi's



MARY ROZELL

1       A.      Yes.

2       Q.      And you were upset?

3       A.      Yes.

4       Q.      Did you speak to anyone else

5   privately besides Leah?

6       A.      I think I spoke to Tasha trying to

7   decide what to do.

8       Q.      What did you say to Tasha about what

9   you should do?

10      A.      I don't remember.  I was approached

11  by Krystie McCauley, Mrs. Ross-Holst's assistant.

12      Q.      What did she say to you?

13      A.      She said I'm sorry about what

14  happened, Mary, and I'm sorry you're in this

15  position.  And she said --

16      Q.      You want to take a break?

17      A.      No.  She said that she thought that

18  Mrs. Ross-Holst would want to speak to me about

19  it.

20              MS. PERATIS:  Do you want a break,

21          Mary?

22              THE WITNESS:  No, I don't.

23      Q.      She said that she thought Ms.

24  Ross-Holst would want to speak to you about what

**MARY ROZELL**

1    you were experiencing?

2         A.    Neil's behavior.

3              MS. PERATIS:   Do you want some

4         tissues?   Let's just pause for a moment.

5         Let her take a breath.

6

7              (Whereupon, a recess was taken.)

8

9    BY MR. WEBER:

10        Q.    Approximately when did Krystie say

11   this to you?

12        A.    I don't remember if it was that week

13   or sometime after the holiday.   I think it was

14   after the holiday.

15        Q.    And what if anything did you say to

16   Krystie in response?

17        A.    I told her I wasn't sure I wanted to

18   do that.

19        Q.    And what did she say?

20        A.    I think, at one point, she said well

21   just let me know, then she kept calling me and

22   saying I really think Mrs. Ross-Holst would like

23   to speak to you about this.   I really think you

24   should talk to her.



MARY ROZELL

202

1          Q.    Do you know if Krystie spoke to Ms.
2     Ross-Holst about what you were experiencing?
3          A.    Before the meeting she did.
4          Q.    Who set up that meeting?
5          A.    Krystie.
6          Q.    So she made arrangements for you to
7     meet with Ms. Ross-Holst?
8          A.    Yes.
9          Q.    It was her idea?
10          A.    Yes.
11          Q.    And she arranged the meeting in
12     January of 2004?
13          A.    Yes.
14          Q.    And with you and Ms. Ross-Holst?
15          A.    Yes.
16          Q.    And did you attend that meeting?
17          A.    I did.
18          Q.    Was that at 71st Street?
19          A.    Yes.
20          Q.    And approximately what day -- strike
21     that.
22                What time of the day did you meet?
23          A.    I think it might have been early
24     afternoon or late morning.

MARY ROZELL

1    Q.    And who was present?

2    A.    Mrs. Ross-Holst and Richard Halpern.

3    Q.    And who is he?

4    A.    He was an outside financial adviser.

5    Q.    Anyone else?

6    A.    That's it.

7    Q.    Tell me who started the meeting.

8    A.    Who started the meeting?

9    Q.    Let me rephrase it.

10         Who first made a statement?

11   A.    I don't remember.

12   Q.    Did Ms. Ross-Holst express concern

13   for you?

14   A.    Yes and no.

15   Q.    Well, give me -- tell me what she

16   said.

17   A.    Well, she said -- at one point I

18   apologized for taking her time and she said that

19   that was okay because she cared about me, and

20   other times she made sex jokes.

21   Q.    Well, tell me exactly what she said?

22

23   A.    She said, I told her that Mr.

24   Pirozzi's comments were especially disturbing to

MARY ROZELL

206

1    to Richard.  And I just brought it up because it

2    was a conflict and I wanted clarification from

3    Courtney on what her --

4            Q.    What was that conflict?

5            A.    The conflict was that Neil took

6    binders of the whole catalog of the art

7    collection, with all the details about it,

8    without asking me and gave them to Mr. Halpern

9    and his staff.

10           Q.    Do you know why he did that?

11           A.    He explained afterwards that he

12   needed them for a few specific reasons.

13           Q.    Did he say what they were?

14           A.    Yes, he said he needed that for

15   determining cost basis and for, I think,

16   questions about the Stephen J. Ross estate and

17   some other thing.

18           Q.    Any reason -- do you have any reason

19   to doubt veracity of those statements?

20           A.    I don't doubt the veracity of those

21   statements, no.

22           Q.    When you said to Ms. Ross-Holst that

23   you thought Mr. Pirozzi's behavior was

24   troublesome did you state specifically what



MARY ROZELL

1    behavior you thought was troublesome?

2         A.    Some of it, not all of it.

3         Q.    What did you state to Ms.

4    Ross-Holst?

5         A.    I told her about the comments about

6    my body and him trying to kiss me.

7         Q.    After the Christmas party?

8         A.    Uh-hum.

9         Q.    What else did you tell her?

10        A.    I don't remember.  I remember there

11   was -- oh, Neil had told me on occasion that when

12   I was out on bed rest he told me that he missed

13   me and that I was the reason why he came to work,

14   and I remember not telling her that.

15        Q.    Okay.  Do you remember anything else

16   you did tell her?  I don't need to know

17   everything you didn't tell her.

18        A.    I don't know specifically.

19        Q.    Again, take a minute and think about

20   it.

21        A.    Just generally about his comments.

22        Q.    What did you say beside the comments

23   about your body and his efforts to kiss you after

24   the Christmas party?



MARY ROZELL

208

```
 1          A.    What specifically did I say?

 2          Q.    Other than those two things.

 3          A.    I think I also told her that the

 4   staff was concerned.

 5          Q.    Anything else did you tell her?

 6          A.    I don't remember.

 7          Q.    What, if anything, did she say in

 8   response?

 9          A.    Well, like I said, she made some

10   jokes.  She told me that she cared about me and

11   she said -- she said, well, what do you want me

12   to do about it.

13          Q.    Right.  What did you say?

14          A.    I think I basically said --

15          MS. PERATIS:  I want the record to

16          reflect the witness said, put the emphasis

17          in that sentence on "me."

18          MR. WEBER:  I'm sorry?

19          MS. PERATIS:  I want the record to

20          reflect that the witness said.

21          MR. WEBER:  What do you want me to

22          do about it?

23          MS. PERATIS:  What do you want me to

24          do about it?
```

dalco
court reporting & legal video

MARY ROZELL

209

1        Q.    What do you want me to do about it

2    is what Ms. Ross said to you; right?

3              MS. PERATIS:  The witness's

4         inflection was significant.

5              MR. WEBER:  Should we go back and

6         also put accents on things as well?

7        Q.    Ms. Ross said to you, what would you

8    want, me, Ms. Ross, to do about it; and what did

9    you say?

10        A.    I told her that I would take care of

11   it.

12        Q.    You would take care of it?

13        A.    Yes.

14        Q.    And what did she say to you?

15        A.    She said okay.

16        Q.    Did Mr. Halpern say anything?

17        A.    I don't think so.

18        Q.    What else was said if anything

19   during that meeting?

20        A.    I don't recall.  I think that's it,

21   generally.

22        Q.    Well, think a minute more and make

23   sure you've told me everything you can about that

24   meeting with Ms. Ross-Holst and Mr. Halpern.



**MARY ROZELL**

213

1            believes how she was treated.

2            Q.    How did you describe your

3    relationship with Ms. Ross to your therapist?

4            A.    With my therapist?  I don't remember

5    how I described it to her.

6            Q.    You talked about Ms. Ross, did you

7    not?

8            A.    Yes.

9            Q.    At length; correct?

10           A.    Probably.

11           Q.    Did you not view your relationship

12   with Ms. Ross as a friendly one during your

13   employment?

14           A.    I thought I had a good relationship

15   with her, yes.

16           Q.    You never complained about her, did

17   you?

18           A.    Complain about her?

19           Q.    About Ms. Ross; did you ever

20   complain about the way she treated you?

21           A.    To her?

22           Q.    Yes.

23           A.    No.

24           Q.    To anybody else?

MARY ROZELL

1       Krystie.

2               Q.      And what was her position?

3               A.      Krystie?  She was Mrs. Ross-Holst's

4       assistant, personal assistant.

5               Q.      What were you told by Darius?

6               A.      I was told that the needs of the art

7       department had changed and that I was no longer

8       needed.

9               Q.      Did he say anything else to you?

10              A.      I asked him who made that

11      determination.

12              Q.      What, if anything, did he say?

13              A.      He said something like the powers

14      that be.

15              Q.      Did he say anything else?

16              A.      I asked him to explain that a little

17      bit more and he said that the collection needed

18      more hands on curatorial work.

19              Q.      Did he say anything else?

20              A.      He gave me a severance agreement,

21      told me I could talk to a lawyer.  He told me I

22      had a half an hour to get out.  He told me that

23      either he or Krystie would be monitoring me the

24      whole time.  He told me that I wasn't allowed to



MARY ROZELL

268

1    touch my computer.  He told me -- I asked him

2    about my staff  said -- asked him if they knew

3    and he said he was going to tell them.

4            I asked him what was going to happen to

5    them and he said, he said that he hoped -- they

6    were expecting Tasha to stay and hoped that she

7    would stay.

8            He told me I should leave through the

9    service elevator so that Mrs. Ross-Holst wouldn't

10   have to see me because that would make her

11   uncomfortable.

12           He came in to monitor what was going on.

13   He tried to take my rolodex from me which I'd had

14   for about 15 years, then he sat down with me and

15   walked through every card in my rolodex and told

16   me which ones related to my job at Andco that had

17   to come out like the address of storage.

18           Then he -- I told him that I wanted my

19   personal documents.  He told me that only he

20   could get them for me and that he would give me a

21   disk, CD, with my documents, and he sat at my

22   desk and I instructed him where my personal

23   documents were and he went through the motions of

24   making a CD and putting my things in the trash.



**MARY ROZELL**

272

1       A.     Either Darius or Krystie, I don't

2  remember.

3       Q.     And did you say good-bye to anybody?

4       A.     On my way out I waved good-bye to

5  Bruce, the chef, who was in the kitchen, and I

6  stopped in the front office where Neil and, I

7  don't know who else was there, maybe Krystie if

8  she wasn't taking me, and I just said good-bye.

9       Q.     Did anybody say anything in

10 response?

11      A.     I think they just looked at me.

12      Q.     Did you speak to anybody else?

13      A.     I don't think so.

14      Q.     Did anyone speak to you as you were

15 leaving?

16      A.     No, I don't think so.

17      Q.     Did you call Ms. Ross-Holst after

18 you got home?

19      A.     No.

20      Q.     Did you put a call in to her at any

21 time after that?

22      A.     I don't think so, no.

23      Q.     Do you know whose decision it was to

24 terminate your employment?

MARY ROZELL

273

1          A.     No.

2          Q.     Do you believe that the decision to

3    terminate your employment was based on your

4    complaint to Ms. Ross-Holst?

5          A.     I do.

6          Q.     What do you base that on?

7          A.     I base that on the fact that I don't

8    believe there was another reason to terminate me.

9          Q.     Anything else?

10         A.     Course of events from the time I

11   reported -- I spoke with Mrs. Holst's, to the

12   time I was fired.

13         Q.     The course of events that you

14   described --

15         A.     Uh-hum.

16         Q.     -- earlier today?

17         A.     Uh-hum.

18         Q.     Anything else?

19         A.     I don't think so.  I'm not sure.

20         Q.     Do you know if Ms. Ross-Holst or Mr.

21   Halpern ever spoke to Mr. Pirozzi about your

22   complaint?

23         A.     I don't know.

24         Q.     Anybody ever tell you that they did?

MARY ROZELL

274

1          A.    No.

2

3                    (Defendants' Exhibit WW,

4                    E-MAIL, was marked for

5                    identification.)

6

7                    (Defendants' Exhibit XX,

8                    E-MAIL, was marked for

9                    identification.)

10

11         Q.    I show you Defendants' Exhibit WW

12    for identification.  Did you ever see that

13    document before, two-page document, two e-mails?

14         A.    What was the question again?  Do I

15    recognize it?

16         Q.    Yes.

17         A.    Yes.

18         Q.    These are your e-mails?

19         A.    Yes.

20         Q.    Did you ever tell anybody you were

21    going to write a tell-all book?

22         A.    No.

23         Q.    Did you discuss with anybody about a

24    consulting -- your consulting aspirations?

**MARY ROZELL**

1                    MS. PERATIS:  When?

2                    MR. WEBER:  2004.

3          A.    2004, probably.

4          Q.    With whom?

5          A.    People that I would talk to about

6     what I was going to do next.

7          Q.    I show you what's been marked

8     Defendants' Exhibit XX, can you identify it?

9          A.    This is an e-mail from me to Bettina

10    Sulser.

11         Q.    Is that your handwriting on that

12    document?

13         A.    Yes.

14

15                    (Defendants' Exhibit YY,

16                    E-MAIL, was marked for

17                    identification.)

18

19         Q.    I show you Defendants' Exhibit YY.

20    Can you identify that document?

21         A.    This is an e-mail from me to the

22    same automaton expert.

23         Q.    Okay.  Prior to your termination

24    from Andco, were you ever looking for another job

**dalco**
court reporting & legal video

MARY ROZELL

276

1    while employed by Andco?

2          A.    I think I sent off a job application

3    while I was there.

4          Q.    Do you remember when?

5          A.    I think it was some time in 2004.

6          Q.    To whom did you send the

7    application?

8          A.    To Skidmore College.

9          Q.    What position were you seeking?

10         A.    Director of the art museum.

11         Q.    Approximately when did you send

12   that?  I know you said 2004.  Can you give me a

13   better --

14         A.    Some time, well, the letter's in my

15   computer, so it would have the exact date.

16         Q.    Sometime prior to end of April,

17   2004?

18         A.    Yes.

19         Q.    And did you hear back from Skidmore?

20         A.    Yes.

21         Q.    And what did they say?

22         A.    I didn't get the job.

23         Q.    Did you seek any other employment

24   prior to the end of April 2004 while you were

MARY ROZELL

1    employed by Andco?

2         A.    I met with a head hunter who I'd met

3    with before, when I first came back to the United

4    States.  She called me, and I had a meeting with

5    her at some point during that period.

6         Q.    During 2004?

7         A.    Uh-hum.  I think it was 2004.

8         Q.    And what's her name?

9         A.    I don't remember.  I don't remember

10   her name.

11        Q.    Do you remember the name of her

12   company?

13        A.    It had something to do with art,

14   management art.  It was based in Connecticut.

15        Q.    Did you give her a resume -- resume?

16        A.    I think so.

17        Q.    And did you tell her what kind of

18   position you were looking for or did she have

19   something in mind for you?

20        A.    No, she had something in mind for me

21   that she contacted me about.

22        Q.    She contacted you first or you

23   contacted her?

24        A.    I think she contacted me.  I don't

MARY ROZELL

278

1    really remember.

2           Q.    Do you think you could find her name

3    and company if you had a chance?

4           A.    I think it's in my computer at work.

5           Q.    At work at Andco?

6           A.    Yes, that's where all my contacts

7    are and were.

8           Q.    So you don't have it at home?

9           A.    No.

10          Q.    Do you remember her last name?

11          A.    No.

12          Q.    Do you remember the name of the

13   company?

14          A.    I just told you what I remembered.

15          Q.    Do you know what town in

16   Connecticut?

17          A.    No.

18          Q.    Did she recommend a particular job

19   for you?

20          A.    She wanted to know if I would be

21   interested in a particular job.

22          Q.    Did she say what the job was?

23          A.    Yes, it was something at the Donald

24   Judd Foundation.



MARY ROZELL

279

1        Q.    And where was that foundation
2    located?

3        A.    I'm not sure where the exact
4    location was.  The activities were split between
5    New York and Martha, Texas.

6        Q.    Did you indicate an interest in the
7    position?

8        A.    I think I indicated to her that I
9    was interested but I wasn't interested.

10       Q.    Okay.  Were there -- did you ever
11   hear back about that opportunity?

12       A.    I don't think so.

13       Q.    Did you seek any other employment or
14   speak to any other headhunters prior to April
15   2004 while at Andco?

16       A.    I don't think so.  I don't believe
17   so.

18       Q.    Did you seek any employment or speak
19   to any headhunters in 2003?

20       A.    I don't think so.

21       Q.    What about in 2002?

22       A.    I don't think so.  I'm not sure.

23       Q.    Since April of 2004, have you sought
24   other employment?



MARY ROZELL

1       A.      Bettina ended up working there on

2    her own because she didn't want to work with me.

3

4                (Discussion held off the record.)

5

6                (Recess taken.)

7

8                (Defendants' Exhibit AAA,

9                E-MAIL, was marked for

10               identification.)

11

12   BY MR. WEBER:

13       Q.      Have you been doing any writing

14   since April of '04?

15       A.      Yes.

16       Q.      What kind of writing?

17       A.      I've been working on books and

18   writing a proposal that I hope will be expanded

19   into more of a scholarly essay on the collection,

20   the Grunebaum collection.

21       Q.      What kind of books are you working

22   on?

23       A.      I've been working on a book, a

24   memoir of my time in Berlin and East Germany

MARY ROZELL

1    after the Wall came down, and I've been working

2    on a fiction novel and a book on Alzheimer's.

3         Q.    Let's take the first one.  What is

4    the first one?

5         A.    The memoir.

6         Q.    The memoir.

7         A.    Uh-huh.

8         Q.    How far along are you on that?  How

9    many pages have you scripted out?

10        A.    I don't know how many pages.

11   There's different -- different sections.  I guess

12   maybe around 50.

13        Q.    And that covers what period of time?

14        A.    It covers -- it starts in '92.  It's

15   not chronological.  It's not in the order yet.

16   It's just little vignettes, through '97 or '98.

17        Q.    Have you talked with a publisher

18   about possibly doing something there?

19        A.    No.

20        Q.    The fiction novel, how far are you

21   along on that?

22        A.    I have about 50,000 words.

23        Q.    Wow.  And what's that about?

24        A.    That's about -- the theme is about

MARY ROZELL

298

1    reassimilation into one's own country, and it's

2    kind of a -- it's a comparison of the cultural

3    values of Europe and America.  It's a little bit

4    of a travel log.  It takes place in Europe, in

5    the United States, and it's a lot about art and

6    the art world.

7              Q.    And you started that in '04?

8              A.    I started that in January of '04.

9              Q.    And have you talked with a publisher

10   about that book?

11             A.    No.

12             Q.    Do you have an agent for that book?

13             A.    No.

14             Q.    Then you have a third thing you're

15   working on I think?

16             A.    Alzheimer's.

17             Q.    A book on Alzheimer's, and how far

18   along are you on that?

19             A.    That book's been ongoing -- if you

20   can call it a book it's not a book, it's just

21   writing.  That's been going on for many years

22   now.  I have, I don't know how many words or

23   pages.  I guess maybe 50 to a hundred pages.

24             Q.    Any agent or publisher in connection

MARY ROZELL

310

1        A.      Yes.

2        Q.      Had she had Alzheimer's for a while?

3        A.      Yes, a long time.

4        Q.      Did you -- when you were seeing your

5    therapist did you discuss Neil Pirozzi?

6        A.      Yes.

7        Q.      Did you discuss all the issues that

8    were concerning you about Mr. Pirozzi with your

9    therapist?

10       A.      Yes, I believe so.

11       Q.      Pardon me?

12       A.      I believe so.

13

14               (Defendants' Exhibit EEE,

15               E-MAIL, was marked for

16               identification.)

17

18       Q.      I show you Defendants' EEE for

19    identification; can you identify that document?

20               MS. PERATIS:  Is there a question

21         pending?

22               MR. WEBER:  I'm asking if she can

23         identify it.

24       A.      This is an e-mail, I guess from

dalco
court reporting & legal video

MARY ROZELL

311

1   Bonnie who's --

2        Q.    Let's start with the bottom, I think

3   it goes up.  I think that's from you to Tiffany?

4        A.    I'm responding to Tiffany.

5        Q.    And that concerns your AOL account?

6        A.    Yes.

7        Q.    And it says, you say to Tiffany,

8   "the AOL account was started when I was -- when

9   we were located at 57th Street?

10       A.    Yes.

11       Q.    Is that Andco's old address?

12       A.    Uh-hum.

13

14                    (Defendants' Exhibit FFF,

15                    CREDIT CARD POLICY, was marked

16                    for identification.)

17

18       Q.    I show you what's marked Defendants'

19   Exhibit FFF.  Can you identify that it?

20       A.    It looks like the credit card policy

21   of August 9th, 2001.

22       Q.    Did you ever see it before?

23       A.    I don't remember if I saw it but it

24   looks like my handwriting on it.

MARY ROZELL

312

1

2                          (Defendants' Exhibit GGG,

3                          CREDIT CARD RECEIPTS-MAIL,

4                          were marked for

5                          identification.)

6

7              Q.    I show you what's been marked as

8     Defendants' GGG consisting of 18 pages.

9                    Is that your handwriting on the

10    first page?

11             A.    On the Post-it?

12             Q.    Yeah.

13             A.    Yes, I think so.

14             Q.    I can't make it out.  Can you tell

15    me what it says?

16             A.    "Peggy, regarding the AOL charge; I

17    changed billing to 23.90 per month on October

18    3rd, 2001.  Apparently this change could not be

19    implemented until end of billing cycle October

20    21st, 2001, and so my old plan was in effect

21    until then.  It will be 23.90 from now on."

22             Q.    Can you describe or explain what

23    this represents?

24             A.    When I started the account, I think

**MARY ROZELL**

322

1

2                              (Defendants' Exhibit III,

3                              E-MAIL, was marked for

4                              identification.)

5

6              MS. PERATIS:  Okay, you can ask

7       questions about it.

8

9   BY MR. WEBER:

10             Q.    We have before you Defendants'

11      Exhibit HHH.  Can you identify that document?

12             A.    This one?

13             MS. PERATIS:  Yes.

14             A.    This was an e-mail from me sent to

15      the administrative office at Art Basel.

16             Q.    What's the administrative office of

17      what?

18             A.    Art Basel; it's the art fair.

19             Q.    Oh, I see.  Okay.  And you're

20      identify -- is this to go on a Web site somewhere

21      or?

22             A.    No, no, I was attending the fair

23      that year.  I was planning on attending the fair

24      that year and they were supposed to send me,

**dalco**
court reporting & legal video

MARY ROZELL

1   every year they send me a package to go with my

2   pass, and I wanted them to send it to my home

3   address instead.

4          Q.    Okay.  And you sent this on May 7th,

5   2004?

6          A.    I guess so.

7          Q.    And that's the home address you

8   gave?

9          A.    Yes.

10         Q.    Were you the director of The Ross

11  Collection at that time?

12         A.    No.

13         Q.    Turning to Defendants' Exhibit

14  triple I, can you identify that document?

15               MS. PERATIS:  I don't think we have

16         it.

17               MR. WEBER:  Sorry.

18         Q.    Can you identify that document?

19         A.    Yes.  This is an e-mail from me to

20  Tasha Seren.

21         Q.    And where you say, first please,

22  quote, Forget to bring the copy of the book stuff

23  to the meeting.  What is that referring to?

24         A.    This refers to a meeting with

dalco
court reporting & legal video