OUTTEN & GOLDEN LLP
Kathleen Peratis (KP 2118)
Mark R. Humowiecki (MH 4368)
3 Park Avenue, 29th Floor
New York, New York 10016
(212) 245-1000
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MARY ROZELL,<br><br>                    Plaintiff,<br>          -against-<br><br>COURTNEY ROSS-HOLST, an individual,<br>ANDCO, LLC, a corporation, and NEIL<br>PIROZZI, an individual,<br><br>                    Defendants. | 05 CV 2936 (JGK)(JCF)<br><br>PLAINTIFF'S RULE 56.1<br>STATEMENT OF MATERIAL FACTS<br>NOT GENUINELY IN DIPUTE |

    1.    Pursuant to Local Rule 56.1, Plaintiff, by her attorneys, Outten & Golden LLP, herby state the following facts as to which there is no genuine issue to be tried.

    2.    Defendant Courtney Ross hired Plaintiff Mary Rozell to oversee Ross's art collection which consisted of thousands of valuable works of art located in her residences in New York, Southampton, Stockholm, Jamaica, and in warehouses in various locations. (C. Ross 211:15-25 at Ex. 1;[1] Rozell 66:11-24, 143:12-144:23 at Ex. 7.)

    3.    Throughout Rozell's employment, she was responsible for all aspects of the entire art department. (C. Ross 216:22-25 at Ex. 1; Job Description at Ex. 16.)

---

[1] (See Transcript of Courtney Sale Ross Deposition on April 25, 2006 ("C. Ross") 5:12-6:2 at Ex. 1.) All references "Ex. _" refer to exhibits attached to the Declaration of Mark R. Humowiecki in Support of Plaintiff's Rule 56.1 Statement of Material Facts Not in Dispute and Plaintiff's Motion for Partial Summary Judgment on Defendant Ross's Trespass Claims and Defendants' After-acquired Evidence Affirmative Defense.

4. At no point did Ross or Neil Pirozzi have or express any complaints about the quality of the art department's work. (C. Ross 219:2-13; Pirozzi 78:16-20, 84:6-13 87:23-88:18, 202:21-24 at Ex. 9)

5. Ross's art collection is an asset of great financial value, and as with other assets, it is important that proper documentation be maintained. For works of art, this includes up-to-date information regarding each item's provenance, purchase price, tax basis, insurance, current value, location, and exhibition history be kept in order. (C. Ross 80:2-7 at Ex. 1; Rozell 141:4-18 at Ex. 7; Affidavit of Mary Rozell in Support of Her Motion for Partial Summary Judgment ("Rozell SJ Aff.") ¶ 4.)

6. Prior to Rozell's hire, the documentation in the Art Department was a "mess" and "in disarray." (Rozell 68:12-13, 122:7-8 at Ex. 7; C. Ross 120:7-18 at Ex. 1; Rozell SJ Aff. ¶ 5.)

7. Ross wanted Rozell to improve the state of the documentation of the art collection. (Rozell 68:10-19 at Ex. 7; Job Description at Ex. 16).

8. Obtaining current appraisals of the art was a significant aspect of Rozell's job and allowed Ross to make decisions regarding selling items of art. (C. Ross 250:5-251:14 at Ex. 1; Rozell 70:2-3, 141:14-15 at Ex. 7; L. Ross 228:5-21 at Ex. 8; Rozell SJ Aff. ¶ 6.)

9. Defendant Pirozzi, ANDCO's CFO, testified that he relied upon Rozell to provide "up to date appraisals." (Pirozzi 65:10-14 at Ex. 9.)

10. Rozell and the art department prepared regular reports of their activities and submitted them to Ross, but Ross did not always read them. (C. Ross 184:24-185:5 at Ex. 1; Rozell SJ Aff. ¶¶ 15, 18-20.)

11. Ross's New York City residence is a double duplex comprising approximately 10,000 square feet, on the twelfth and thirteenth floors of an apartment building on East 71st Street. (Narizzano 16:16-25, 76:15-81:9 at Ex. 6; Rozell 86:6-89:21 at Ex. 7.)

12. Defendant ANDCO, Inc., a limited liability corporation that comprises all the "financial underpinnings" of Ross's personal life. (C. Ross 39:11-22 at Ex. 1.)

13. Ross's New York City residence was the work location of Rozell and the other art department employees, as well as Ross's household staff comprising about fifteen to twenty people. (Narizzano 24:6-25:25 at Ex. 6.)

14. The art department staff consisted of the director/curator, Rozell; the archivist, Tasha Seren; and the collection's coordinator, Leah Ross. (Rozell SJ Aff. ¶ 2.)

15. Rozell's office was in a room called the "black and white office," located off the kitchen on the twelfth floor of the residence. (Narizzano 80:13-23 at Ex. 6; L. Ross 26:4-8, 167:4-19 at Ex. 8.)

16. The offices of the other art department employees were on the first floor of the same building. (Narizzano 78:2-7 at Ex. 6.)

17. Rozell, along with Ross's head butler, Darius Narizzano, routinely exercised the authority to admit business visitors to the residence. (Narizzano 154:17-155:23, 157:4-9 at Ex. 6; L. Ross 59:4-61:3 at Ex. 8.)

18. Narizzano supervised the household staff and had overall responsibility for "everything to do with the [inside of the] physical plant." (Narizzano 27:5-16, 28:14-29:12 at Ex. 6.) He was responsible for authorizing and overseeing maintenance, safety and security of the household. (Id. 30:18-31:7, 207:18-208:8.)

19. Ross considered Narizzano, who has "been in our family" for seventeen years, a trusted friend. (C. Ross 91:18-92:22, 97:7-15 at Ex. 1.)

20. Rozell did not need anyone's permission to admit business visitors into the residence. (Narizzano 32:15-34:9 at Ex. 6.)

21. Rozell was highly protective of Ross's privacy and the confidentiality of the art collection. (Rozell SJ Aff. ¶ 3; Rozell 92:5-93:21 at Ex. 7; L. Ross 215, 218 at Ex. 8; Pirozzi 179:22-180:15, 206:23-207:4, 244:13-246:2 at Ex. 9.)

22. Many business visitors entered the residence each day, especially when Ross was not "in residence." They included plumbers, electricians, carpenters, architects (Narizzano 45:11-13, 138:6-14 at Ex. 6), conservators (*id.* 92:18-20, 113:19-21), framers, hangers (*id.* 46:25, 49:9-12, 92:22-25, 93:9-12, 111:4-7, 12-15), delivery people, heating and air conditioning contractors, installation and repair people (*id.* 96:18-25), information technology consultants (*id.* 98:17-19), rug cleaners (*id.* 108:11-15), leather repairer (*id.* 118:14-25), clock repairers (*id.* 124:7-9), gown conservators (*id.* 127:4-8), florists (*id.* 177:15-18), movers (*id.* 178:4-6), security personnel (*id.* 178:13-17), photographers (*id.* 179:4-7), piano tuners (*id.* 181:8-13), insurance brokers (*id.* 180:14-19), and art appraisers (*id.* 140:20-141:2-5). Business visitors might be in any part of the residence, wherever their services were required, including the master bedroom. (*Id.* 363:4-6, 10-13.)

23. ANDCO staff was careful to schedule business visits so as not to disrupt Ross's daily life and to be as quiet as possible when Ross was present at the East 71st Street residence. (Narizzano 84:6-10 at Ex. 6; L. Ross 60:8-16 at Ex. 8; Rozell SJ Aff. ¶¶ 3, 16.)

24. There were no written rules regarding the procedure for admitting business visitors to the residence. (*Id.* 86:17-23; L. Ross 219:21-220:10, 221:10-17 at Ex. 8; Rozell SJ Aff. ¶ 19.)

25. Ross did not require Rozell or Narizzano to obtain "advanced approval" from her to admit any business visitor. (Narizzano 210:25-211:9 at Ex. 6.)

26. Leah Ross was "allowed to bring people in to analyze or conserve artwork." (*Id.* 189:22-190:5.)

27. There was no list of "authorized persons" allowed admittance to the residence, nor one of unauthorized persons to whom admittance was denied. (*Id.* 151:21-152:23.)

28. The were no special rules regarding admittance to the master bedroom — if work needed to be done there, business visitors and contractors were brought in. (*Id.* 363:2-6; Rozell SJ Aff. ¶ 21.)

29. There was no rule against admitting experts to the residence to appraise art. (Narizzano 195:30-196:2 at Ex. 6; Szczepanek 173:10-23 at Ex. 10.)

30. Rozell's decision to admit Sotheby's appraisers to the residence in January 2003, was a "judgment call." (Narizzano 196:4-197:2 at Ex. 6; L. Ross 257:7-17 at Ex. 8.)

31. Rozell was authorized to have appraisers come to the residence to appraise art. (Narizzano 144:17-24 at Ex. 6.)

32. At present, Szczepanek admits expert art appraisers to the residence to perform appraisals without advance approval from Ross. (Szczepanek 171:22-173:15 at Ex. 10.)

33. There was no policy against admitting "auction house people" to come in to appraise art. (Rozell SJ Aff. ¶ 21.)

34. Rozell did not violate a written policy when she told her staff to admit the Sotheby's art appraisers. (Szczepanek 196:4-197:2 at Ex. 10; L. Ross 257:7-17 at Ex. 8.)

35. Rozell typically obtained appraisals from highly specialized and respected art experts, who regularly provide appraisals in the course of their business. These experts include private art dealers and consultants such as Barry Friedman, Paul Asenbaum, C&M Arts, and Allan Stone, as well as experts in different departments at Sotheby's, Christie's and Phillips auction houses. Professional "all-purpose" appraisers were rarely used during her tenure because they charge for their work. (Rozell SJ Aff. ¶ 8)

36. Rozell relied on three different auction houses to provide appraisals for the collection, all of which were documented and continually updated for Ross in the "Master Appraisal Binder" that Ross consulted when determining which art works she would like to sell. (Rozell SJ Aff. ¶¶ 8, 9.)

37. As of late 2002, Ross indicated that she wanted to sell a number of paintings, including three that hung in the master bedroom of her residence. (Rozell SJ Aff. ¶¶ 10, 11.)

38. In detailed "De-accessioning Strategies" written regularly by Rozell for Ross, Rozell suggests how and when various artworks slated for de-accessioning by Ross should be sold. Strategies were made based on current art market conditions; maximizing profit and tax considerations; and issues of discretion and Ross's personal relationships in the art world. (Rozell SJ Aff. ¶ 10.)

39. Ross instructed Rozell to obtain up-to-date appraisals, without charge, in November 2002. (Rozell SJ Aff. ¶ 11.)

40. In November 2002, Rozell sought up-to-date appraisals for many of Ross's art works that had been designated for possible de-accessioning. (Rozell SJ Aff. ¶ 12.)

41. Rozell asked Emmanuel Di-Donna of Sotheby's, a friend whom she trusted to be discrete, to view and appraise the paintings the next time he was in New York. (Rozell 245:18-248:7 at Ex. 7; Rozell SJ Aff. ¶¶ 12-15.)

42. Rozell reported her conversations with Di-Donna to Ross. (Rozell 246:15-24 at Ex. 7; Rozell SJ Aff. ¶ 15.)

43. Rozell was aware that Ross had no intention of selling the paintings through an auction gallery. (Rozell SJ Aff. ¶ 10.)

44. Rozell asked Di-Donna to provide appraisals only. (Rozell 245:18-246:4 at Ex. 7; Rozell SJ Aff. ¶ 12.)

45. Rozell asked her staff to arrange for Di-Donna to visit the residence and perform the appraisals when Ross would not be in residence. (Rozell 249:8-252:6 at Ex. 7; Rozell SJ Aff. ¶ 16.)

46. The staff generally scheduled business visits when Ross was not in residence so as not to disturb Ross. (Narizzano 84:6-10 at Ex. 6; L. Ross 60:8-16 at Ex. 8; Rozell SJ Aff. ¶¶ 3, 16.)

47. At the time of the visit, Rozell was out on a maternity leave. (Rozell 248:22-24 at Ex. 7; Rozell SJ Aff. ¶ 16.)

48. Rozell instructed her staff to accompany Di-Donna and his colleagues at all times. (Rozell 249:11-18 at Ex.7; Rozell SJ Aff. ¶ 17.)

49. The art department reported the visit to Ross in its weekly status reports. (Rozell SJ Aff. ¶¶ 18-20.)

50. Contrary to Rozell's express instructions, Sotheby's followed up the site visit with an elaborate "mock up" of an auction catalogue (the "Catalogue," at Ex. 12) which featured

some of the artworks in her bedroom, rather than simply providing the requested appraisals in the form of a letter. (Rozell at 243:23-244:17 at Ex. 7.)

51. James Niven, Vice-Chairman of Sotheby's New York personally sent the Catalogue with a cover letter, dated February 26, 2003 ("Niven's Letter," at Ex. 13). (Rozell Dec. ¶ 4 at Ex. 11.)

52. When Leah Ross and Szczepanek received Niven's Letter and the Catalogue, they immediately identified the mistake and called Rozell at home so that she could contact Sotheby's to correct it. (L. Ross 247:8-14, 249:17-250:11 at Ex. 8; Szczepanek 146:12-147:9, 248:12-24 at Ex. 10.)

53. The next day, February 27, 2003, Ross telephoned Rozell at home and expressed anger about the Sotheby's visit and the fact that the art appraisers had been allowed in her bedroom without her prior permission. (Rozell SJ Aff. ¶ 23; Rozell 259:2-4; 259:20-22 at Ex. 7; Rozell Dec. ¶ 5 at Ex. 11; C. Ross 156:12-157:3 at Ex. 1.)

54. Rozell contacted Niven, who apologized and, on February 28, 2003, sent another letter to Ross ("Niven's 2nd Letter," at Ex. 14), that included only the appraisals and not the catalogue, as originally requested by Rozell. (Rozell SJ Aff. ¶ 22; Rozell Dec. ¶ 7 at Ex. 11.)

55. Ross sold the three paintings during Rozell's tenure, and relied on the values contained in the Sotheby's appraisal to determine their price. (Rozell SJ Aff. ¶ 24.)

56. Ross had had a "run in" with Rozell concerning Sotheby's. (C. Ross 137:13-138:9 at Ex. 1.)

57. Ross "got a letter from Jamie Niven." (*Id.* 137:13-138:9.)

58. Ross was "upset" (*Id.* 137:17-20), and asked Mary "how could you have done that, how could you have let somebody into my bedroom?" (*Id.* 138:10-16).

59. Rozell apologized to Ross. (*Id.* 138:17-18.; Rozell 259:24-260:9 at Ex. 7.)

60. Rozell and Ross never spoke of the incident thereafter (C. Ross. 158:12-159:2 at Ex. 1; Rozell 259:24-260:9 at Ex. 7; Rozell SJ Aff. ¶ 23).

61. Ross claims that her decision in April 2004 to fire Rozell was based in part upon Ms. Rozell's "letting someone into my bedroom." (C. Ross 139:7-16; 143:12-17 at Ex. 1.)

62. In a telephone call, Ross admonished Rozell "about letting an [auction house representative] into [her] bedroom." (*Id.* 156:12-157:3.)

63. Ross claims that she fired Rozell because of her purported lack of judgment based on letting an appraiser into Ross's apartment without her permission. (*Id.* 219:21-24.)

64. Ross met with her lawyers before her deposition. (*Id.* 33:11-34:7.)

65. Ross read Rozell's deposition transcript before her deposition. (*Id.* 33:11-17.)

66. Ross was secure and confident in her testimony about the fact that she knew before Rozell's termination that someone from Sotheby's had been in her bedroom ("Ross's original testimony"). (Ross's Videotaped Testimony, Ex. 20.)

67. Ross did not hesitate or stumble or express any uncertainty during Ross's original testimony. (*Id.*)

68. During her deposition, Ross cut off a question, saying that she is "not finished" and declaring that she is "going to finish [her] answer" (*Id.;* C. Ross 143:3-10 at Ex. 1.)

69. Ross explained that she decided to restructure and terminate Rozell based on the fact that she knew that Rozell had let someone from Sotheby's in her bedroom. (C. Ross at 143:12-23 at Ex. 1; Ross's Videotaped Testimony at Ex. 20.)

70. Michael Weber, Esq., Ross's attorney, did not ask her questions about the Sotheby's incident at her deposition. (Ex. 1.)

71.  Ross submitted an "Errata Sheet" that retracted all of her testimony in which she stated that she knew before Rozell's termination that Sotheby's representatives had been in her bedroom. (Ex. 2)

72.  Ross claims that her testimony that she knew before Rozell's termination that Sotheby's representatives had been in her bedroom was "incorrect." (*Id.*)

73.  In her Errata Sheet, Ross claims that she "was not aware that Ms. Rozell had actually allowed Sotheby's representatives into my bedroom" (*Id.*)

74.  Ross's Errata Sheet does not provide any explanation for why her testimony was incorrect. (*Id.*)

75.  Ross did not mention any new evidence or information that caused her to reconsider her original testimony. (*Id.*)

Date: New York, New York
September 1, 2006

_____
Kathleen Peratis (KP 2118)
Mark R. Humowiecki (MH 4368)
**OUTTEN & GOLDEN LLP**
3 Park Avenue, 29th Floor
New York, New York 10016
Telephone: (212) 245-1000

Attorneys for Plaintiff